SAUK COUNTY, Plaintiff-Respondent,

v.

Marcus J. GUMZ, Glacier Farms, Inc., and Marcus Gumz Foundation, Inc., Defendants,

Ben MASEL, Defendant-Appellant.

Court of Appeals

*No. 02–0204. Oral argument February 27, 2003.—Decided July 24, 2003.*

2003 WI App 165

(Also reported in 669 N.W.2d 509.)

770

On behalf of the defendant-appellant, the cause was orally argued by and submitted on the briefs of *Jeff Scott Olson, The Jeff Scott Olson Law Firm, S.C.,* Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Barbara J. Janaszek* and *James P. Denis III* of *Whyte Hirschboeck Dudek S.C.,* Milwaukee; and *Todd Liebman, Sauk County Corporation Counsel,* Baraboo. There was oral argument by *Barbara J. Janaszek.*

Before Vergeront, P.J., Dykman and Roggensack, JJ.

¶ 1. VERGERONT, P.J. This action was brought by Sauk County to enjoin an event known as "Weedstock 2000" from taking place because no license had been obtained under the County's open-air assembly ordinance. Ben Masel, the organizer of the event, appeals the circuit court's decision and order declaring that the ordinance is constitutional, enjoining him[1] from holding Weedstock in Sauk County without compliance with the ordinance, and dismissing his counterclaims against the County. Masel contends the ordi-

---

[1] The court enjoined all defendants, but Masel is the one defendant to appeal.

nance: (1) violates the First Amendment because it is an impermissible prior restraint and does not meet the standards required for content-neutral time, place, and manner restrictions; (2) violates the equal protection clause of the Fourteenth Amendment; (3) impermissibly conditions the exercise of First Amendment rights on the relinquishment of other constitutional rights; and (4) has penalties so excessive that procedures required for criminal penalties are applicable.

¶ 2. We conclude that, based on the undisputed facts, the following provisions of the ordinance do not meet the requirement that they be narrowly tailored to achieve a significant government interest and are therefore invalid under the First Amendment: the sixty-day advance filing requirement, SAUK COUNTY CODE OF ORDINANCES (SCO) §§ 12.02(1) and 12.04(1); the forty-five-day processing time period, SCO § 12.05; the prohibition against advertising, promoting, and selling tickets before a license is issued, SCO § 12.02(1); the requirement of the zoning administrator's certification, SCO § 12.02(8)(b); and the license fee in excess of $100 per application, SCO § 12.02(3). We also conclude that without a processing time for applications, the entire ordinance violates the First Amendment. We decide all other challenges to the ordinance against Masel. Accordingly, we reverse the trial court's summary judgment dismissing Masel's counterclaim in paragraph 202, and we reverse its order permanently enjoining Masel from holding Weedstock without a license under the ordinance. We affirm the trial court's order dismissing Masel's counterclaims in paragraphs 201 and 203–07. We remand with instructions to enter summary judgment in favor of Masel on the counterclaim in paragraph 202, to dismiss the complaint against Masel, and for further proceedings as appropriate.

## BACKGROUND

¶ 3. The purpose of Weedstock is to disseminate information about the beneficial properties of hemp and to demonstrate support for the legalization of both hemp and marijuana. This event has been held annually on Memorial Day weekend since 1992. In 1995, 1998, and 1999 it was held on property owned by Marcus Gumz in Sauk County.

¶ 4. In the spring of 2000, Masel began to make plans to hold "Weedstock 2000" over the Memorial Day weekend at the Gumz property.[2] The gathering was to be a four-day event and to include speakers, demonstrations, and exhibits, as well as message-laden entertainment in the form of singing and dancing. Masel advertised Weedstock 2000 on the Internet. He obtained insurance and filed an application for a state camping permit indicating he expected that as many as 4,000 people would attend and they would camp at the site for some or all of the four days. However, he did not apply for a permit under Sauk County's open-air assembly ordinance because he believed the ordinance to be unconstitutional.

¶ 5. SAUK COUNTY CODE OF ORDINANCES § 12.02(1) provides:

> [no] person shall permit, maintain, promote, conduct, advertise, act as entrepreneur, undertake, organize, manage, or sell or give tickets to an actual or reasonably anticipated assembly of 1,000 or more people which continues or can reasonably be expected to continue for 18 or more consecutive hours ... unless a license to hold the assembly has first been issued by the

---

[2] Although Masel was a primary organizer of the event, it was sponsored by Weedstock, an unincorporated association.

governing body of this County . . . application for which must be made at least sixty (60) days in advance of assembly.

The ordinance applies to public or private property, except permanently established places of assembly. SCO § 12.02(1) and (6). The stated intent of the ordinance is to:

regulate the assemblage of large numbers of people, in excess of those normally needing the health, sanitary, fire, police, transportation and utility services regularly provided in this County, in order that the public peace and good order, the health, safety and welfare of all persons in this County . . . may be protected.

SCO § 12.01(1).

¶ 6. When Sauk County learned that Masel was advertising Weedstock 2000 on the Gumz property but had not obtained a license, the County law enforcement and judiciary committee (law enforcement committee) issued a notice of violation and order of abatement. Upon learning that Masel intended to proceed with the event without a permit, the County filed this action seeking a temporary restraining order to halt the event. The circuit court granted that motion. Masel answered the complaint and also filed counterclaims, seeking a declaration that the ordinance was unconstitutional, an injunction against enforcement, damages and attorney fees.

¶ 7. The County moved for summary judgment, asking the circuit court to declare the ordinance constitutional and to permanently enjoin Masel from holding Weedstock without a license as required by the ordinance. Masel opposed the motion and asked that summary judgment be entered declaring the ordinance unconstitutional on a number of grounds and seeking

other relief. The court granted the County's motion, concluding that the ordinance satisfied the criteria for a constitutional time, place, and manner regulation, and adopting the rationale presented by the County on all other issues. The court enjoined Masel from holding Weedstock in Sauk County unless he complied with the ordinance, and it dismissed all his counterclaims.

## DISCUSSION

¶ 8. We review de novo a trial court's decision on a motion for summary judgment, applying the same standard as the circuit court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is appropriate if there are no genuine issues of material fact and one party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2) (2001–02).[3] The parties here agree that there are no disputed issues of fact. Which party is entitled to judgment as a matter of law depends, in this case, on whether the ordinance violates the First Amendment protections of freedom of speech and freedom of assembly, made applicable to the states through the Fourteenth Amendment, and on the application of other constitutional provisions. Whether an ordinance is constitutional presents a question of law, to which we apply a de novo standard of review. *State v. Janssen*, 219 Wis. 2d 362, 370, 580 N.W.2d 260 (1998).

---

[3] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

## I. First Amendment

A. *Applicable Standards*

¶ 9. We first consider the proper standard to apply in deciding whether the Sauk County ordinance affords the protections required by the First Amendment.[4] Both parties agree that the standard articulated in *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), is applicable. There the Court concluded that the requirement of a permit and fee before authorizing public speaking, parades, or assemblies was a prior restraint on speech, which carried a heavy presumption against its validity. *Id.* at 130. The standards such an ordinance must meet to be constitutional, the Court stated, were that "[i]t may not delegate overly broad licensing discretion to a government official," and "any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a signifi- cant governmental interest, and must leave ample alternatives for communication." *Id.*

¶ 10. Masel contends that in addition to the *Forsyth* standards, we must apply the procedural requirements established in *Freedman v. Maryland*, 380 U.S. 51 (1965). That case addressed a state statute requiring that every motion picture film be submitted to a board of censors, which was authorized to reject certain films even if the content was protected by the First Amendment. *Id.* at 52. Recognizing that a scheme that conditioned expression on a licensing body's prior approval of

---

[4] The First Amendment is applicable to the state and local units of government through the Fourteenth Amendment. *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1098 (9th Cir. 2003).

content presented "peculiar dangers to constitutionally protected speech," the Court held that a film licensing process must contain these procedural safeguards in order to avoid constituting an invalid prior restraint: (1) any restraint prior to judicial review may be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court. *Id.* at 57–59.

¶ 11. Masel's argument that these procedural safeguards apply in this case is not tenable after *Thomas v. Chicago Park District*, 534 U.S. 316 (2002). The ordinance challenged there required a permit for use of public parks for an assembly, parade, or other event with more than fifty individuals or for an activity with amplified sound. The plaintiffs argued that the ordinance was invalid because it did not require the park district to initiate litigation every time it denied a permit and did not specify a deadline for judicial review of a challenge to a permit denial. 534 U.S. at 322. The Court rejected this contention, stating:

> *Freedman* is inapposite because the licensing scheme at issue here is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum. The Park District's ordinance does not authorize a licensor to pass judgment on the content of speech: None of the grounds for denying a permit has anything to do with what a speaker might say. Indeed, the ordinance (unlike the classic censorship scheme) is not even directed to communicative activity as such, but rather to *all* activity conducted in a public park .... And the object of the permit system (as plainly indicated by the permissible grounds for permit denial) is not to exclude communication of a particular

content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event . . . .

We have never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in *Freedman*. "A licensing standard which gives an official authority to censor the content of a speech differs *toto coelo* from one limited by its terms, or by nondiscriminatory practice, to consideration of public safety and the like." . . . Such a traditional exercise of authority does not raise the censorship concerns that prompted us to impose the extraordinary procedural safeguards on the film licensing process in *Freedman*.

*Id.* at 322–23 (citation and footnote omitted).

¶ 12. The Court continued by acknowledging that "content–neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression," and referred to *Forsyth* and related cases as providing the standards to protect against that possibility. *Id.* at 323. Applying those standards, the Court concluded the ordinance was constitutional. *Id.* at 323–25.

¶ 13. The Sauk County ordinance, like that at issue in *Thomas*, does not provide for subject-matter censorship. Masel does not contend that the Sauk County ordinance is not content neutral, and we conclude that it is content neutral: nothing in the ordinance permits an official to condition a permit or impose requirements based on the content of the speech to be expressed at the assembly. Masel attempts to

distinguish *Thomas* on two grounds: (1) the ordinance there concerned use of public property only, while the Sauk County ordinance applies to both public and private property;[5] and (2) the Sauk County ordinance contains a prohibition on advertising an event before a license is granted. However, neither of these distinctions make the Sauk County ordinance a subject-matter censoring scheme like that challenged in *Freedman*, and that is the basis on which the Court in *Thomas* concluded that *Freedman* did not apply.

¶ 14. Masel also argues that because the Sauk County ordinance in his view allows a level of discretion forbidden by *Forsyth*, censorship considerations may play a hidden role in a decision to deny a license, and thus the *Freedman* procedural safeguards are necessary. However, the Court in *Thomas* did not link the applicability of the *Freedman* safeguards to whether the *Forsyth* standards were met; rather, the applicability of *Freedman* was linked to whether the ordinance on its face provided for subject-matter censorship. As the court in *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 21 (1st Cir. 2002), observed:

> In *Thomas* . . . the Court clarified that *Freedman's* procedural requirements do not apply to permit schemes that eschew any consideration of the content of speech, but, rather, limit themselves to addressing public safety concerns. At the same time, the Court reaffirmed the pertinence of the *Forsyth County* line of cases to such permit schemes . . . .

(Citation omitted.)

---

[5] Masel does not argue that the Sauk County ordinance may not constitutionally apply to assemblies on private property, and we therefore assume it may. Since his position is that the *Forsyth* standards apply, we take that as a concession that those standards apply both to public and private property.

¶ 15. We conclude that, under *Thomas*, the *Freedman* procedural requirements do not apply to the Sauk County ordinance because the ordinance does not provide for subject-matter censorship but instead is a content-neutral regulation of the time, place, and manner of assemblies. *Forsyth* therefore provides the proper framework for our analysis.

## B. *Application of* Forsyth *Standards*

¶ 16: Masel contends that a number of provisions in the ordinance are invalid because they allow officials overly broad discretion, others are not narrowly tailored to meet significant government interests, and there are not ample alternative channels of communication.[6]

■

¶ 17. Although generally statutes and ordinances are presumed constitutional, both parties agree that when freedoms protected by the First Amendment are

---

[6] Masel makes a facial challenge to the ordinance, rather than limiting his challenge to those that he asserts are unconstitutional as applied to him. A facial challenge is an exception to general standing rules and is permitted when the claim is that an ordinance violates the First Amendment by delegating overbroad discretion to the decision maker. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992). The County objects to Masel's standing to challenge certain provisions in a cursory footnote in its appellate brief. It appears that in the circuit court the County did not raise the issue of Masel's standing in its affirmative defenses or by motion, but referred to it only in a footnote in its brief on summary judgment. The County's cursory objection to Masel's standing is not an adequate development of its argument on this issue, and we therefore do not address it.

affected, the government has the burden of proving the validity of the challenged enactment. *Lounge Management, Ltd. v. Town of Trenton*, 219 Wis. 2d 13, 20, 580 N.W.2d 156 (1998). Specifically, in the context of challenges to a regulation under the *Forsyth* standards, the burden is on the government to show that the regulation meets those standards. *See Weinberg v. City, of Chicago*, 310 F.3d 1029, 1038 (7th Cir. 2002).

1. Overly Broad Discretion

¶ 18. A government regulation that allows arbitrary application is "inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." *Forsyth*, 505 U.S. at 130 (citation omitted). Thus, the ordinance must contain "narrow, objective, and definite standards to guide the licensing authority." *Id.* at 131 (citation omitted).

¶ 19. Masel asserts that the requirements relating to fencing/boundary markers, lighting, security guards, sound, and numbers of people are not objective and definite because they contain the terms "reasonable," "necessary," "sufficient," and "similar"; the provision on fencing/boundary markers, in addition, permits the committee to require a fence if it is "reasonably determined to be necessary *to protect the health, safety and welfare of the attendees, the community, and/or neighboring property owners.*" SCO § 12.03(2)(a) (emphasis added).[7] According to Masel, these terms and

_____

[7] SAUK COUNTY ORDINANCE § 12.03(2) provides that the applicant must "demonstrate compliance" with the listed requirements before a license may issue. These include:

782

phrases are vague and allow for subjective judgments that could involve hostility to an assembly's message.

(a) A fence or other easily recognizable boundary marking system that completely encloses the proposed location; a fence may be required by the Law Enforcement & Judiciary Committee if it is *reasonably determined to be necessary to protect the health, safety and welfare of the attendees, the community, and/or neighboring property owners;*

. . . .

(f) If the assembly is to continue during hours of darkness, "illumination *sufficient* to light the main activity area of the assembly at a sufficient level to ensure safety, but not to shine *unreasonably* beyond the boundaries of the location of the assembly ... [and] [i]n addition, the Law Enforcement & Judiciary Committee may require the lighting of parking areas and avenues of ingress and egress if *reasonably necessary* to protect public safety;

. . . .

(j) Security guards *sufficient* to provide adequate security for the maximum number of people to be assembled. A primary security officer, who is a licensed security officer in the State of Wisconsin or has other *similar* credentials, shall be designated, whose name, address and telephone number shall be provided to local law enforcement.

. . . .

(*l*) All *reasonable necessary* precautions to insure that the sound of the assembly will not carry beyond the boundaries of the location of the assembly . . . .

(Emphasis added.)

SAUK COUNTY ORDINANCE § 12.04(3)(f) provides that, among other information, the application must state the "maximum number of persons which the applicant shall permit to assemble at any time, not to exceed the maximum number which can *reasonably* assemble at the location of the assembly, in consideration of the nature of the assembly . . . ." (Emphasis added.)

¶ 20. The cases applying the "narrow, objective and definite" standard articulated in *Forsyth* do not require the degree of specificity that Masel propounds. The provisions that courts have held do not meet this standard generally fall into three groups: (1) they contain no criteria at all to guide an official's decision making, *see, e.g., City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 754 n.2 (1988) (authorizing the imposition of "other terms and conditions deemed necessary and reasonable by the Mayor"); *Weinberg v. City of Chicago*, 310 F.3d 1029, 1044 (7th Cir. 2002) (no criteria for issuing a peddler's license); *American Target Advertising v. Giani*, 199 F.3d 1241, 1252 (10th Cir. 2000) (requiring a permit for fundraising to contain, in addition to certain specified information, "any additional information the division may require"); (2) they expressly allow officials to make value judgments about the applicants, *see, e.g., Staub v. City of Baxley*, 355 U.S. 313, 321 (1958) (authorizing denial of permits based on character of applicant, nature of the organization's business and "its effects upon the general welfare of citizens of the City of Baxley"); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 149–50 (1969) (authorizing a governmental body to deny a permit for a parade or demonstration if "in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require [denial]") (citation omitted); or (3) they contain only a broad overall purpose that is not tied to any specific factors or considerations, *see, e.g., Forsyth*, 505 U.S. at 127 (authorizing an official to adjust the amount of the fee "to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed") (citation omitted); *DeBoer v. Village of Oak Park*, 267 F.3d 558, 573 (7th Cir. 2001) (authorizing officials to

permit use of village hall if the use "benefits the public as a whole"); *Indo-American Cultural Society, Inc. v. Township of Edison*, 930 F. Supp. 1062, 1064 (D.N.J. 1996) (authorizing a governmental body to issue a permit for public gatherings of a certain size "upon such terms and conditions as it deems necessary and proper to ensure public health, safety and welfare").

¶ 21. In contrast, courts have upheld provisions that identify the legitimate government concerns at stake even though they allow the officials some discretion, and even though the criteria are stated in qualitative rather than quantitative terms. *See, e.g., Thomas*, 534 U.S. at 319 n.1, 324 (ordinance listed ten grounds on which a permit may be denied, one of which is that the intended use or activity "would present an unreasonable danger to the health or safety of the applicant, or other users of park"); *MacDonald v. City of Chicago*, 243 F.3d 1021, 1026 (7th Cir. 2001) (requiring official to consider whether the proposed parade will "substantially or unnecessarily interfere with traffic," whether there are available "sufficient city resources to mitigate the disruption" or a "sufficient number of peace officers to police and protect lawful participants and non-participants from traffic-related hazards" and whether the concentration of persons will "prevent proper fire and police protection or ambulance service"); *Douglas v. Brownell*, 88 F.3d 1511, 1522 (8th Cir. 1996) (authorizing the police chief to deny a parade permit "if the time, route, or size of the parade will disrupt the use of a street ordinarily subject to significant congestion or traffic") (citation omitted); *United States v. Kistner*, 68 F.3d 218, 221 (8th Cir. 1995) (mandating that a permit issue unless contrary to the purposes of "avoid[ing] overcrowding and overlapping activities, . . . preserv[ing] peace and tranquility, . . .

prevent[ing] dangers to public health or safety, and . . . minimiz[ing] damage to park resources and facilities"); *Long Beach Lesbian and Gay Pride, Inc. v. City of Long Beach*, 17 Cal. Rptr. 2d 861, 870 (Cal. Ct. App. 1993) (requiring as conditions for a parade permit that the event will not "unduly impede . . . public use of the street . . . or the operation of the emergency vehicles or city services and functions" and not "present a substantial or unwarranted safety or traffic hazard") (citation omitted).

¶ 22. As the cases in the preceding paragraph recognize, the constitution does not require that government officials have no discretion and flexibility in deciding whether and under what conditions to grant permits and licenses for parades and assemblies. *See Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."). Moreover, the very words that Masel objects to are ones that courts view as limiting discretion. *MacDonald*, 243 F.3d at 1028 ("substantially," "unnecessarily," "sufficient" provide a threshold of harm and so provide additional limitations on the officials' discretion); *City of Madison v. Bauman*, 162 Wis. 2d 660, 665, 680, 470 N.W.2d 296 (1991) (word "unreasonably" in ordinance prohibiting noise "tending to unreasonably disturb the peace and quiet of persons in the vicinity" "prevents excessive discretion in the police and . . . gives guide to persons in respect to their conduct"). *See also Long Beach Lesbian and Gay Pride*, 17 Cal. Rptr. 2d at 870 ("unduly," "substantial," "unwar-

ranted" provide "measures . . . [that] are not beyond common or objective understanding").

¶ 23. We are satisfied that the provisions relating to fence/boundary markers, lighting, security guards, sound, and numbers of people are specific and objective enough to guide the discretion of county officials and do not leave the decisions on these points to the "whim" of those officials. *Forsyth*, 505 U.S. at 133.

¶ 24. We reach the same conclusion regarding two other provisions that, Masel contends, give the County officials unbridled discretion: the exemption for certain government financially sponsored fairs and the requirement of a bond.[8] The ordinance provides that it does not apply "to government financially sponsored

---

[8] In Masel's initial brief he also challenged on this ground the requirement that an applicant must file with the county clerk's office:

> [a] statement executed by the zoning administrator for the governmental unit having zoning authority over the affected area that the proposed event is a permitted use within the zoning district where the event is to be held, or permit issued by the zoning administrator that otherwise certifies the event is an authorized use.

SCO § 12.02(8)(b). The County responded that this provision is not vague and does not give the County any discretion: it plainly requires that the applicant provide a very specific statement or permit from the zoning administrator of the governmental unit having zoning authority over the area affected by the proposed event. However, the County acknowledged in its brief that this provision must meet the narrowly tailored standard, and that issue was explored at oral argument. We agree with the County that this provision does not give the County discretion, and we conclude that Masel's objection to

fairs such as are held on regularly established fairgrounds nor to assemblies required to be licensed by other ordinances and regulations of this County." SCO § 12.02(7). Masel contends that this provision authorizes the County to exempt any assembly it favors simply by agreeing to act as one financial sponsor for the proposed assembly and offering the assembly on a fairground. That is not a reasonable reading of the language preceding the conjunction "nor": the language plainly refers only to "fairs" that are "held on regularly established fairgrounds." These terms have common meanings that are well understood, and there is no vagueness or ambiguity that permits the use Masel advances.

¶ 25. Masel has two objections to the bond requirement. Assemblies of 5000 or more must post a bond either in cash or underwritten by a surety company in an amount of "$1.00 per person for the minimum number of people permitted to assemble." SCO § 12.03(2)(m).[9] The County asserts "minimum" is a misprint and should read "maximum." This resolves one of Masel's objections—that a rate based on the "mini-

---

this provision is more appropriately addressed as a challenge under the narrowly tailored standard. We therefore address it in that section.

[9] SAUK COUNTY ORDINANCE § 12.03(2)(m) provides in full:

> For assemblies over 5,000 persons, a bond filed with the clerk of the County, either in cash or under written by a surety company licensed to do business in Wisconsin at the rate of $1.00 per person for the minimum number of people permitted to assemble, which shall indemnify and hold harmless this County or any of its agents, servants and employees from any liability or causes of action which might arise by reason of granting this license, and from any cost incurred in cleaning up any waste material produced or left by the assembly.

mum" permitted to assemble is confusing. The "maximum number of people permitted to assemble" is not confusing, because the applicant must identify in the application "the maximum number of persons which the applicant shall permit to assemble at any time." SCO § 12.04(3)(f).

¶ 26. Masel's second objection is that the bond is to indemnify and hold harmless the County and its agents "from any cost incurred in cleaning up any waste material produced by or left by the assembly," but there is no procedure for determining and resolving disputes about the cleanup costs. In Masel's view, this allows for the same type of unbridled discretion as did the ordinance held invalid in *Forsyth*. We disagree. That ordinance authorized adjustment of the amount of the fee "to meet the expense incident to the administration of the Ordinance and to the maintenance of public order" in the matter licensed. 505 U.S. at 131 n.9. That very general language, as construed by that governmental unit, allowed the administrator to take into account the likely response to the content of the speech in order to decide how much to charge for police protection. *Id.* at 133–35. In this case, the language Masel objects to is specifically directed to the cost "incurred in cleaning up any waste material produced or left by the assembly" and to nothing else: it does not give the County discretion to take into account the content of the speech in any way, nor does it give the County the authority to consider anything other than the cleanup costs. Masel has provided us with no case law indicating that such a provision is invalid unless it establishes procedures for determining and resolving disputes about the cleanup costs, and we therefore decline to address this issue further.

## 2. Narrowly Tailored to Serve Significant Government Interest

¶ 27. The requirement that a time, place, and manner regulation be narrowly tailored to serve a significant government interest is met when the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (citation omitted). The government is not required to use the least restrictive means to achieve its objective. *Id.* at 798. The court stated:

> Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals[,] . . . [s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

*Id.* at 799–800 (citation omitted).

¶ 28. Although the parties agree that the above formulation is the general standard we are to apply, Masel argues we must use more scrutiny in applying it to this ordinance because the ordinance covers both private and public property. He relies on *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), and *Spence v. State of Washington*, 418 U.S. 405 (1974), the former addressing a ban on all but certain specified signs on residential property, and the latter reviewing a criminal prosecution for displaying a flag with a peace symbol on it on the defendant's property. In each case, the fact that the

display was on the person's own property as opposed to public property was a part of the Court's analysis leading to the conclusion that the regulation or statute was unconstitutional. Neither case suggests that we are to apply the standard articulated in *Ward* differently because a content-neutral time, place, and manner regulation applies to both public and private property. However, the nature of the property regulated, including whether it is public or private, may enter into the determination in a particular case whether the narrowly tailored standard is met.

¶ 29. The parties also debate whether the government may rely on "common sense" to meet the standard or must present "substantial evidence." The County relies on a phrase from *Graff v. City of Chicago*, 9 F.3d 1309, 1323 (7th Cir. 1993), in advancing the former position; Masel relies on a passage from *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 666 (1994), for the latter. We conclude that each party is reading more into the respective cases than a careful reading allows.

¶ 30. If the County's position is that it need not present evidence to meet its burden of showing that the provisions Masel challenges are narrowly tailored to meet a significant government interest, but instead may appeal to "common sense" in the absence of evidence, we reject that position. We do not read *Graff* as broadly as the County does. The portion of the *Graff* decision on which the County relies is a discussion of whether the district court could properly decide on a motion to dismiss that a time, place, and manner restriction was reasonable, rather than waiting for a motion for summary judgment. In concluding that was permissible, the court observed that when, as in that

case, courts had "upheld a similar ordinance because of the governmental interests at stake, a future litigant should not be able to challenge similar governmental interests without showing some distinction at the pleading stage." *Graff*, 9 F.3d at 1323.[10] The court therefore rejected the plaintiff's contention that the government had to present evidence to meet its burden of demonstrating the reasonableness of its regulation restricting the sale of newspapers to newsstands. *Id.* The County in this case did not seek a dismissal of Masel's counterclaims based on the pleading, and the County has pointed to no case upholding an ordinance similar to the open-assembly ordinance such that it would be feasible to decide at the pleading stage the issues Masel raises.[11]

---

[10] The court continued, using the term "common sense" on which the County relies:

> In this case there are no disputed issues of material fact that we need to resolve. Nor are the interests that Chicago raises in this case unique or different. It has not relied on independent research studies or findings. Rather, *Chicago has relied on a common sense approach* and the desire to best allocate public property within the spirit of the First Amendment. As discussed in Part C, we conclude that as a matter of law Chicago can reasonably restrict newsstands to selling daily newspapers. Thus, the district court properly dismissed at the pleading stage Graff's arguments that the ordinance should allow him to operate a larger newsstand in which to sell books, videotapes and other methods of expression.

*Graff v. City of Chicago*, 9 F.3d 1309, 1323 (7th Cir. 1993) (emphasis added).

[11] We observe that we are not bound by *Graff* or the decision of any federal court except the United States Supreme Court, although we may choose to follow the analyses of those courts if we find them persuasive. *Streff v. Town of Delafield*, 190 Wis. 2d

¶ 31. On the other hand, if Masel's position is that we do not defer to the County's judgment on the best method to meet a significant government interest when the County shows it has chosen a reasonable method, we reject that position. The language Masel relies on in *Turner* is part of a discussion of the courts' role in reviewing congressional regulation of speech, the gist of which is that, although the courts are to "accord substantial deference to the predictive judgments of Congress," they are also to evaluate the basis for those judgments to make sure they have "either empirical support or at least sound reasoning." *Turner*, 512 U.S. at 665–66 (citation omitted).[12] This follows quota-

---

348, 526 N.W.2d 822 (Ct. App. 1994). Since our reading of *Graff* leads us to conclude its analysis is not applicable here, we need not evaluate it further.

[12] The passage in *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 665–66 (1994), from which Masel quotes is as follows, with emphasis added to the portion he quotes:

> That Congress' predictive judgments are entitled to substantial deference does not mean, however, that they are insulated from meaningful judicial review altogether. On the contrary, *we have stressed in First Amendment cases that the deference afforded to legislative findings does "not foreclose our independent judgment of the facts bearing on an issue of constitutional law."* This obligation to exercise independent judgment when First Amendment rights are implicated is not a license to reweigh the evidence *de novo*, or to replace Congress' factual predictions with our own. *Rather, it is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence. See Century Communications Corp. v. FCC*, 835 F.2d 292, 304 (D.C. Cir. 1987) ("*[W]hen trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures*").

(Emphasis added) (citations omitted).

tion of language we have cited above from *Ward. Id.* at 662. We are satisfied that *Turner* does not add to the standard the government must meet to succeed against a challenge that a content-neutral time, place, and manner regulation is not narrowly tailored to serve a significant governmental interest.

¶ 32. We next examine each provision Masel challenges to determine whether it meets the standard for narrow tailoring articulated in *Ward*.[13]

(a) Signatures

¶ 33. The requirement of a license under the ordinance applies to any "person," which is defined as an individual, "partnership, corporation, firm, company, association, society or group." SCO § 12.02(1) and (2)(a). The application for a license must be signed by an individual applicant, by all officers of an applicant corporation, by all partners of an applicant partnership, by all officers of an applicant association, society or group, and, "if there be no officers, by all members of such association, society or group." SCO § 12.04(2). Masel contends that this last requirement compels disclosure of association membership, which, he asserts, must be justified by a compelling interest and

---

[13] In his first brief, Masel does not argue that the County does not have a significant interest in regulating the assembly of large numbers of people for the purposes of protecting order, health, and safety. In his reply brief, he appears to question whether the County has any significant interest advanced by any part of the ordinance because there are already rules promulgated by the Department of Health and Family Services for camping. We do not address issues raised for the first time in the reply brief, *State v. Chu*, 2002 WI App 98, ¶ 42 n.5, 253 Wis. 2d 666, 643 N.W.2d 878, and we therefore address only those provisions of the ordinance for which Masel presents a developed argument in his first brief.

substantial relationship between the information sought and legitimate government goals. He relies on *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). Masel appears to concede that the County has a significant government interest in having someone in authority apply for and be held responsible for the assembly, but, he contends, the requirement that all members of an association sign is not narrowly tailored to promote that interest.

¶ 34. The County responds that the ordinance permits an individual member of an association to apply for a permit, but if no one is willing to do so and if the association has no officers, there is no alternative means to meet the County's significant interest. Masel replies that the plain language of the ordinance does not allow an individual to sign as a representative of an association. However, this misses the point we understand the County to be making: there is nothing in the ordinance that prevents an individual member of an unincorporated association with no officers from applying and signing as an individual applicant. Masel does not argue that if no individual is willing to do that and if there are no officers, the requirement that all members sign is not narrowly tailored or does not meet the test of *NAACP*, assuming without deciding that case applies.

¶ 35. We conclude the County's construction of the ordinance is consistent with the language of SCO §§ 12.02(1), (2)(a) and 12.04(2) and is a reasonable construction: an individual who is a member of an association may apply as an individual for a license and

sign that application.[14] As thus construed, we conclude the ordinance is narrowly tailored to serve the government's significant interest in having an identifiable individual or individuals willing to take responsibility for an open-air assembly.

(b) Advance Filing and Processing Time Periods

¶ 36. The ordinance requires that an applicant file the application for a license at least sixty days in advance of the proposed assembly, SCO §§ 12.02(1) and 12.04(1), and the application "shall be processed within forty-five (45) days of receipt." SCO § 12.05. Prior to the license being issued, no one may "permit, maintain, promote, conduct, advertise, act as entrepreneur, undertake, organize, manage, or sell or give tickets to" the assembly. SCO § 12.02(1). Masel does not appear to dispute that some advance filing requirement may be imposed, but he asserts that sixty days in advance with forty-five days for processing the application is far longer than any approved in the case law for similar events, and that the County's justification does not meet the narrowly tailored standard.

¶ 37. The evidence of the County's reasons for these requirements consists of its answers to interrogatories. In those, it explains that the law enforcement committee meets only once a month. It also states that the decision not to have regular County employees issue licenses is a "legislative decision made by the Sauk

---

[14] In a facial challenge, when language is susceptible to a narrowing construction that avoids a First Amendment problem, courts are to construe it in that way. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). *See also Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988); *Gooding v. Wilson*, 405 U.S. 518, 524–28 (1972).

County Board," and that the law enforcement committee may decide certain county departments need to get involved and may assign them tasks—the county clerk, the Planning and Zoning Department, Public Health Department, Sheriff's Department, and the Corporation Counsel's Office.[15] The County contends that the frequency of the law enforcement committee meetings and the involvement of other departments justify the sixty-day advance filing requirement. It also contends that the cases Masel refers to are distinguishable factually, because political demonstrations require a spontaneity that the open-air assemblies do not and parade permits do not need the long-term planning that an assembly of more than 1000 persons for more than eighteen hours does.

¶ 38. We do not agree with the County that the need for spontaneity in speech that responds to current events, *see Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994), is irrelevant in a facial challenge to this ordinance. It may be that the two assemblies that have thus far been held under this ordinance did not have any political purpose, and it is undisputed that the event of Weedstock is an annual event. However, since this is a facial challenge we must consider that this ordinance would apply to a person or group who desired to have an assembly (of the specified size and duration) to respond to a current event or issue, and we analyze the advance filing requirement and the processing time with that in mind.

---

[15] The County asserts in its brief that "the boards responsible for health and safety matters" meet only once a month and refers us to the answers to interrogatories cited above; but those state the meeting frequency only for the law enforcement committee.

¶ 39. We do agree with the County that whether an advance filing requirement and processing time is narrowly tailored to serve a significant government interest must be analyzed in the context of the particular permit or licensing scheme, and that cases addressing permits for parades or demonstrations that are a few hours duration or have a small number of people are not necessarily applicable in this case. Accordingly, we agree that the short time periods that have been held by the courts to be valid for parade or demonstration permits—ranging from less than twenty-four hours to eleven days[16]—are not necessarily the bench-

---

[16] The advance filing requirements that courts have upheld for parades or demonstrations have generally been less than a week: *A Quaker Action Group v. Morton*, 516 F.2d 717, 735 (D.C. Cir. 1975) (two-day advance notice requirement for demonstrations of up to 3000 in front of White House is reasonable); *Progressive Labor Party v. Lloyd*, 487 F. Supp 1054, 1059 (D. Mass. 1980) (three-day advance filing requirement for parade permit approved in context of a broader challenge); *Handley v. City of Montgomery*, 401 So.2d 171, 183 (Ala. Crim. App. 1981) (filing requirements that have the result of requiring applications between four and eleven days before the event, and nine days for the plaintiff, is reasonable given the need for advance planning); *Powe v. Miles*, 407 F.2d 73, 84 (2d Cir. 1968) (two-day advance filing requirement for parade is reasonable); *Jackson v. Dobbs*, 329 F. Supp 287, 292 (N.D. Ga. 1970) (marchers must obtain permit by 4:00 p.m. on day before the march) *aff'd* 442 F.2d 928 (5th Cir. 1971). On the other hand, in the following cases, advance filing requirements for parade permits of between five days and thirty days have been held to violate the First Amendment because the municipalities have not demonstrated the need for them: *Long Beach Lesbian and Gay Pride, Inc. v. City of Long Beach*, 17 Cal. Rptr. 2d 861, 871 (Cal. Ct. App. 1993) (thirty days); *NAACP v. City of Richmond*, 743 F.2d 1346, 1355–57 (9th Cir. 1984) (twenty-day advance

mark for this case. Nevertheless, the County must provide some evidence showing that the sixty-day advance filing requirement and the forty-five-day processing time directly and effectively serve a significant government interest, and we conclude it has not done so.

filing requirement for parade permit not supported by evidence; logically, police and traffic concerns can be addressed in a much shorter time period; and case law and treatises show that other municipalities had much shorter time periods); *York v. City of Danville*, 152 S.E.2d 259, 263–64 (Va. 1967) (no evidence that the requirement that the application for a parade permit be made between thirty and sixty days before the proposed event was necessary to prepare for policing of streets or regulation of traffic); *Douglas v. Brownell*, 88 F.3d 1511, 1514, 1523–24 (8th Cir. 1996) (city's asserted goals of protecting pedestrian and vehicular traffic and minimizing inconvenience to the public does not justify five-day advance filing requirement for any parade, defined as ten or more persons).

We observe that one of the cases on which Masel relies, *Rosen v. Port of Portland*, 641 F.2d 1243, 1248 n.10 (9th Cir. 1981), was concerned with an advance notice requirement unrelated to a permit system: that is, the regulation required that persons who wanted to distribute leaflets at the airport had to notify the authority twenty-four hours in advance. The court held that this was invalid because the advance notice requirement imposed a prior restraint on free speech. We do not view this case as helpful because it is not concerned with the amount of time that is needed to process an application for a permit or license to assemble, parade, or demonstrate. Another case that Masel cites as an example of an invalid five-day advance filing requirement, *Grossman v. City of Portland*, 33 F.3d 1200, 1206–07 (9th Cir. 1994), did not separately address the validity of that requirement, but instead held the entire ordinance was overbroad because it applied to a single person wearing a T-shirt with a message. That analysis is not useful here.

¶ 40. There is no doubt the County has a significant interest in evaluating applications to make sure that they comply with the requirements, and it also has a significant interest in planning for extra police, fire, or other services that may be needed when such a large gathering occurs. We also appreciate the fact that the forty-five-day period within which it is to make its decision allows an unsuccessful applicant fifteen days to seek court review of the decision. But there is nothing in the record from which we can conclude that forty-five days is a reasonable time period for processing the application or that sixty days is a reasonable filing requirement. The fact that the law enforcement committee meets only once a month is not an adequate justification, without any evidence, or reasonable inferences from the evidence, indicating why that committee cannot meet more often or why other personnel who are more available cannot process the applications. The explanation that this is a legislative decision of the Sauk County Board does not meet the constitutional standard. Similarly, the fact that other departments are involved is not a constitutionally sufficient explanation, since there is no evidence or reasonable inferences from the evidence that these other departments need this amount of time to process an application.[17]

[17] Although both parties moved for summary judgment, each thereby taking the position that there are no disputed issues of fact, that does not preclude this court in our de novo review from deciding if disputed issues of fact require a trial. Even when evidence is not disputed, if there are conflicting reasonable inferences from that evidence, those conflicting inferences may create genuine material factual disputes that entitle one party to a trial. *See Hennekens v. Hoerl*, 160 Wis. 2d 144, 162, 465 N.W.2d 812 (1991). We therefore consider not just the evidence, but reasonable inferences from the evidence,

¶ 41. The County supports its advance filing requirement with the Seventh Circuit Court of Appeals decision in *Thomas v. Chicago Park District*, 227 F.3d 921, 925–26 (7th Cir. 2000). The park district ordinance there provided that "applications for permits be filed 30 days in advance—60 days if special facilities [were] to be involved, such as sound amplification, which unless limited can violate the city's noise ordinance." 227 F.3d at 925. In response to the plaintiff's objections that these periods were too long and inhibited rallies responding to fresh news, the court concluded that, "since thousands of permit applications are filed with the park district every year, it would be burdensome to require the park to process the applications in a significantly shorter time. The park district's policy, moreover, is to allow 'spontaneous' rallies in reaction to current events." *Id.* at 926. The Supreme Court in *Thomas* did not address this advance filing requirement—perhaps because the plaintiffs did not argue before that Court that the ordinance was not narrowly tailored, but only that it afforded the officials overly broad discretion. *Thomas*, 534 U.S. at 323 n.3. The Supreme Court did refer to the provision that the district "must decide whether to grant or deny an application within 14 days unless, by written notice to the applicant, it extends the period an additional 14 days," *id.* at 318 (citation omitted); and it concluded that this provision together with others provided narrow, definite, and objective standards. *Id.* at 324.

¶ 42. Neither decision in *Thomas* supports the County's position. The sixty-day advance filing require-

mindful that at the summary judgment stage the court must draw all reasonable inferences in favor of a party before granting summary judgment against that party. *Grams v. Boss*, 97 Wis. 2d 332, 339, 294 N.W.2d 473 (1980).

ment in *Thomas* was only for special situations, and the need for even the thirty-day requirement was supported by the high volume of applications and ameliorated by the exception for spontaneous rallies in reaction to fresh news. 227 F.3d at 926. In addition, the 14/28–day processing time there is significantly shorter than the forty-five-day processing time here. The evidence in this case does not show a high volume of applications. Indeed, the record identifies only two applications under this ordinance and none under the predecessor ordinance enacted in 1970. County's counsel asserted at oral argument that Sauk County is a small rural county without a large staff. Although there is no evidence of the size of the staff, we will accept counsel's assertions as facts for purposes of this appeal. Nonetheless, these facts do not create an inference that the County needs a sixty-day advance filing requirement and forty-five days processing time for the very infrequent applications under the ordinance.[18]

---

[18] We also observe that the open-air assembly ordinance in effect from 1970 to 1999 provided for a thirty-day advance filing requirement and a maximum processing time of twenty days. SCO §§ 19.02A, 19.04A, 19.05 (1990). Since there were no applications under that ordinance, there is nothing in the record from which we can infer the longer time period in the current ordinance is needed. Furthermore, of the eleven open-air assembly ordinances the County has provided from other counties, ten require a thirty-day advance filing requirement; ADAMS COUNTY ORDINANCE No. 1, "An Ordinance Licensing the Assemblage of Large Numbers of People in Adams County, Wisconsin" (1970); COLUMBIA COUNTY CODE OF ORDINANCES, ch. 3, "Public Assemblies"; CRAWFORD COUNTY ORDINANCE § 12.04, "Large Assemblies" (1999); GREEN COUNTY CODE OF ORDINANCES, ch. 2, "Rock Festivals"; JUNEAU COUNTY ORDINANCE § 9.02, "Regulations of Large Assemblies" (2002); MARQUETTE COUNTY ORDINANCE § 4.02, "Assembly of People"; ROCK COUNTY CODE OF ORDI-

¶ 43. We conclude that, based on the record before us, the requirement that an application must be made sixty days before the event and the provision affording the County forty-five days to act on the application are not narrowly tailored to serve a significant governmental interest that has been identified by the County as requiring these time periods.

(c) Advertising/Promotion/Ticket Sales Before License Issued

¶ 44. The ordinance prohibits not only holding an assembly without a license but promoting, advertising, and selling tickets for the assembly before the license is issued. This means that during the forty-five days the ordinance allows the County to process an application, the applicant cannot promote or advertise the event without violating the ordinance, nor can the applicant sell tickets to raise money to meet the insurance and other costs involved in obtaining a license.[19] At oral argument, counsel for the County conceded that the

NANCES, ch. IV, "Rockfest"; VERNON COUNTY ORDINANCE PSO-11, "Regulation and Licensing of Large Assemblies" (2002); RACINE COUNTY CODE OF ORDINANCES, art. III, "Assemblage of Large Numbers of People" (1975); WASHBURN COUNTY CODE ch. 6, art. II, "Large Outdoor Gatherings" (1982); the first eight of these provide twenty days for processing applications. If any factual inference may reasonably be drawn from these ordinances, it is that a thirty-day advance filing requirement and twenty days to process an application is adequate to meet the needs of these counties. Thus, these ordinances do not support the County's position. Of course, Sauk County may have different circumstances than these other ten counties that make longer time periods reasonable, but it has presented no evidence of that.

[19] In his affidavit, Masel avers that Weedstock and other grassroots assemblies must sell tickets in advance in order to

ordinance would probably prevent Masel from advertising the date and time of Weedstock before he received a license even if the advertisement also said "license applied for." The County's counsel also conceded that there was a less direct impact on health and safety with respect to the advertising/promotion prohibition than other provisions of the ordinance. Nonetheless, counsel asserted that prohibiting promotion and advertisement of an assembly before a license issues prevents a situation where a license is denied but a large group of people show up anyway, and this purpose meets the narrowly tailored standard. We do not agree. The advertising and promotion prohibition is a complete prohibition on speech—though for a limited period of time. There is nothing in the record of a factual nature that shows a need for this prohibition, nor for the prohibition against selling tickets before a license is issued. We conclude these prohibitions burden "substantially more speech than is necessary to further the government's legitimate interests" of health and safety. *Ward*, 491 U.S. at 799.[20]

---

pay for the required insurance. Masel also avers that even the act of arranging for insurance in advance, which is required, is prohibited by SCO § 12.02(1) because it involves "act[ing] as an entrepreneur" and "organiz[ing]." It is not reasonable to construe that section as prohibiting activity specifically required for the application in other sections of Chapter 12, such as obtaining insurance, and we therefore construe SCO § 12.02(1) not to prohibit such activities. *See Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 449, 405 N.W.2d 354 (Ct. App. 1987) (we construe statutes to avoid unreasonable results).

[20] It may be that, as a direct prohibition on speech, a more stringent standard is warranted with respect to the advertising and promotion prohibitions than that applicable to content-neutral time, place, and manner regulations. However, we need

(d) Certification from Local Zoning Administrator

¶ 45. An applicant must provide a certification by the zoning administrator having authority over the affected area that the proposed event is a permitted use or an authorized use. SCO § 12.02(8)(b). An addendum to the application provides a form, with a signature line for the local zoning administrator (or Sauk County Director of Planning and Zoning if the location is subject to Sauk County zoning), which states that the administrator certifies that the proposed event "does not violate this unit of government's ordinances or land use regulations, or that the applicant has obtained any required approval from this unit of government to conduct this event." At oral argument, County's counsel explained that the purpose of this requirement was to avoid a situation where the County unwittingly issued a license for an open-air assembly that violated a local zoning ordinance; however, she conceded that the applicant was bound by any applicable local zoning ordinances even if this provision were not in the open-air assembly ordinance, and that it was probably not necessary to have this provision in the ordinance. She also conceded that one could not tell from the face of the zoning ordinance of the Town of Fairfield, which has jurisdiction over the Gumz property, whether Weedstock was the type of "use" that ordinance was intended to cover and how one went about getting a determination from the zoning administrator whether it was or was not.

---

not address that issue, because we conclude the prohibition does not meet the standard of narrowly tailored to serve a significant government interest.

¶ 46. We agree with the County that, as a general proposition, the County has a significant interest in not authorizing open-air assemblies that violate the laws of other governmental entities. However, we conclude the County has not demonstrated that SCO § 12.02(8)(b) is narrowly tailored to meet that interest. There is no evidence and no argument that the enforcement mechanisms of the zoning jurisdictions are inadequate to address any violations of their ordinances; there is no evidence that events such as Weedstock are "uses" that are governed by those ordinances; and there is no provision in the one zoning ordinance on the record for requiring the zoning administrator to certify uses as authorized that are not governed by the ordinance.

(e) License Fee, Insurance, and Bond

¶ 47. Masel challenges the license fee, insurance requirement, and bond requirement on the ground that these impose impermissible financial burdens on the exercise of speech. We conclude that the County has met its burden of showing that all of these requirements meet the constitutional standard except the license fee above a flat $100 per application.

¶ 48. The ordinance provides that a license is valid for a period of five consecutive days after which a new license shall be required, and the fee for each license is $100 for each day of the event. SCO § 12.02(3). Masel contends that a valid license fee must be nominal and this is not; and a valid fee must be tied to the costs of the administration of the permit system, and this is not because it cannot logically cost more to process an application for a five-day event than a one-day event. Masel's argument on these points are brief, but as we understand it, his argument is directed

806

to the $100–per-day aspect of the fee and he is not challenging a flat license fee of $100 per application.

¶ 49. It is well established that the government may charge a fee for applying for a permit or license for a parade or similar gathering if the fee is to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (citation omitted). In *Cox*, the Court upheld a license fee for parades, performances, and open-air public meetings of "not more than three hundred dollars for each day [the event was to] take place," *id.* at 571 n.1 (citation omitted).

¶ 50. However, there is no requirement that the fees be nominal in amount, as Masel contends. In *Forsyth*, the Court made it clear that cases reading *Murdoch v. Pennsylvania*, 319 U.S. 105 (1943), to hold that a license fee must be "nominal" to be constitutional were in error. 505 U.S. at 136–37. The cases Masel relies on for his argument that fees must be nominal in amount were decided before *Forsyth* and are no longer good law on this point—*Central Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1523 (11th Cir. 1985), and *Invisible Empire Knights of KKK v. City of West Haven*, 600 F. Supp 1427, 1434 n.10 (D. Conn. 1985).[21]

---

[21] Masel is also incorrect in asserting that only administrative costs of processing the applications may be taken into account in setting a license fee. *Cox* referred in addition to expenses incident to "maintenance of the public order in the matter licensed." 312 U.S. at 577. Although a fee may not be based on the costs of police protection or other municipal

■

¶ 51. As for the requirement that the fees be tied to administrative expenses, the County asserts that it "is self-evident" that the cost of administering applications under the ordinance "is likely to total more than several hundred dollars." However, we agree with Masel that it is not self-evident that the cost of administering each application bears a direct ratio to the number of days of the event, and there is nothing in the record from which we can reasonably infer this. There is, indeed, nothing in the record indicating what is involved in processing the applications. The County refers us to no case that concludes a license or permit fee is a reasonable amount to cover administrative expenses in the absence of any evidence on those expenses, and our own research discloses that courts do require evidence. *See, e.g., Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050, 1056 (2d Cir.

services when they may be related to the content of the speech—such as more police protection needed when speech is unpopular, *see Forsyth County,* 505 U.S. at 133–35—courts have allowed fees that cover costs of municipal services necessary to maintain order during the event when based on objective criteria and unrelated to the content of the speech. *See, e.g., Stonewall Union v. City of Columbus,* 931 F.2d 1130, 1133 (6th Cir. 1991) (approving a fee for the costs of traffic control during a parade, based on such relevant factors as time, date, route length, the number of participants, and the number of vehicles). *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1321–22 (11th Cir. 2000) (approving fees based on sliding scale considering the anticipated allowance to cover costs of personnel required). In this case, the County does not assert any basis for the license fee other than the administrative costs of processing the applications; therefore we do not address whether the County could lawfully charge for maintaining public order.

1983) (concluding $200 license fee for march invalid where district court had found no evidence that amount was equal to the amount incurred in processing the request); *Northeast Ohio Coalition for the Homeless v. City of Cleveland*, 105 F.3d 1107, 1110 (6th Cir. 1997) (approving peddler's licensing fee of $50 as reasonable in view of undisputed evidence that the cost of administering the ordinance was $43 per permit and lack of evidence that the fees were charged for any other purpose); *Center for Auto Safety, Inc. v. Athey*, 37 F.3d 139, 143, 145 (4th Cir. 1994) (approving under *Cox* sliding fee scale based on size of charitable organization applying for permit to solicit funds because evidence shows costs of monitoring charities increased with size of charities). *See also Baldwin v. Redwood City*, 540 F.2d 1360, 1371 (9th Cir. 1976) (fee of $1 per sign is invalid since it is not reasonable to charge $500 for inspecting 500 identical signs for size; the "absence of apportionment" suggests the fee is not reimbursement for the costs of inspection). Accordingly, we conclude that, because there is no evidence or reasonable inference from the evidence that a charge of $100 per day of the event is tied to the costs of administering the applications, fees over $100 per application do not meet the requirements of *Cox* and *Forsyth*.

¶ 52. The ordinance also requires that an applicant file with the county clerk a certificate of insurance providing that the applicant and assembly are covered by a "comprehensive general liability policy providing a minimum coverage of $2,000,000 aggregate coverage." SCO § 12.02(8)(c). One of Masel's objections to this provision has already been resolved—his contention that advance ticket sales prevent persons and groups who do not have treasuries from raising money

for insurance premiums. We have concluded above that the ordinance may not prohibit persons from selling tickets without a license.

¶ 53. A second objection to the insurance requirement is that there is no provision for a waiver if the applicant cannot obtain insurance because the applicant's message is too controversial.[22] Masel asserts this is necessary because otherwise insurance companies may make subjective decisions about which applicants to insure based on their message. He relies on *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050; *Collin v. Smith*, 447 F. Supp 676 (N.D. Ill. 1978), *aff'd* 578 F.2d 1197 (7th Cir. 1978); and *Pritchard v. Mackie*, 811 F. Supp 665 (S.D. Fla. 1993). However, we agree with the County that none of these cases support invalidating the insurance requirement in this case because of the lack of such a waiver.

¶ 54. In *Collin*, there was evidence that the municipality exempted some groups from the insurance requirement without any standards for doing so, thus enabling groups that had the approval of the municipality to avoid the requirement. 447 F. Supp at 685. In *Eastern Connecticut Citizens Action Group*, the court held the insurance requirement was impermissible for the particular plaintiff because of the evidence relating to that group's past marches;[23] the court did not invalidate the insurance requirement because it did not

---

[22] Masel does not argue that the County does not have a significant interest in having insurance coverage for attendees who may sustain personal injuries at an event.

[23] The court referred to evidence that the group's prior marches did not result in any claims or injuries, the lack of evidence that claims had ever been made resulting from use of the rail bed (the location of the march), evidence of the

contain a waiver for unpopular causes, but simply referred to the district court's comments on this topic in a footnote, stating "[a]n insurance requirement *may* raise other constitutional issues." 723 F.2d at 1056 n.2 (emphasis added). In *Pritchard*, the court cited that footnote from *Eastern Connecticut Citizens Action Group* as one ground for invalidating an insurance requirement imposed on a particular group, but the overriding reason was the court's conclusion that the unwritten insurance requirement was a condition "designed to prevent the rally" by that particular controversial group. 811 F. Supp at 669. In short, none of the cases relied on by Masel, and none we have been able to find, hold that a regulation requiring insurance is facially invalid unless it contains an exemption for an applicant who cannot obtain insurance because of a controversial message.

¶ 55. The evidence in this record is that Masel or his associates obtained insurance for every Weedstock event except for one held in Crawford County and that was because they ran out of money. Masel deposed that once they were able to find a company that would provide the insurance on an ongoing basis, which took a "good bit of looking the first time," they have not had trouble in obtaining insurance.

¶ 56. For assemblies over 5000, an applicant must post a bond in the amount of $1 per person

> for the minimum number of people permitted to assemble, which shall indemnify and hold harmless th[e] County or any of its agents . . . from any liability or

measures the group took to ensure the safety of walkers, and the waiver forms each participant signed. *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050, 1056–57 (2d Cir. 1983).

causes of action which might arise by reason of granting this license, and from any cost incurred in cleaning up any waste material produced or left by the assembly.

SCO § 12.03(2)(m). Masel argues that under this provision the costs of cleanup may be based, not on the activities of those associated with the gathering, but on the community's hostile reaction expressed by throwing things or putting up signs. However, in the cases he relies on, there was either an ordinance or a practice that allowed charges based on police or other services needed because of the reaction of the community to the speaker's message, coupled with evidence that the reaction of the community had been taken into account in assessing the charges. *Central Florida Nuclear Freeze Campaign*, 774 F.2d at 1517 n.2, 1524–25; *Indo-American Cultural Soc'y*, 930 F. Supp. at 1064, 1068; *Invisible Empire Knights of KKK v. Mayor of Thurmont*, 700 F. Supp. 281, 283–84, 286 (D. Md. 1988). In this case, the ordinance states "waste material produced or left by the assembly," SCO § 12.03(2)(m), and there is no evidence that the County has ever charged an applicant for waste material produced by those opposed to the gathering.

¶ 57. Masel makes an additional challenge with respect to all three financial requirements: he contends that any license fee, insurance requirement, or bond must contain a waiver for a person who cannot afford to pay those sums. The Eleventh Circuit in *Central Florida Nuclear Freeze Campaign,* on which Masel relies, held that one of the grounds on which the charge there for additional police protection was invalid was that there was no provision exempting those who could not afford that charge. 774 F.2d at 1523–24. The

court reasoned that "[t]he granting of a license permit on the basis of the ability of persons wishing to use public streets and parks to demonstrate, to pay an unfixed fee for police protection, without providing for alternative means of exercising First Amendment rights, is unconstitutional." *Id.* However, as the Sixth Circuit has pointed out, in *Central Florida Nuclear Freeze Campaign*, it was significant that failure to prepay the additional police charges precluded the applicants from engaging in the constitutionally protected activity. *Stonewall Union v. City of Columbus*, 931 F.2d 1130, 1137 (6th Cir. 1991). In *Stonewall Union*, the court concluded that an indigency exemption or waiver was not required for the fee for a parade in the streets, because the sidewalks and parks of the city were available without charge for parades and related speech activities. *Id.* We conclude the reasoning of the court in *Stonewall Union* is sound when applied to this case: the license required here is for large assemblies (over 1000 people and the bond requirement is for over 5000) that will last more than eighteen hours. As we discuss in the next section, Masel has ample alternative means of assembling and speaking to express the views of Weedstock. He has provided us with no authority that persons are constitutionally entitled to hold a gathering of the size and duration covered by this ordinance if they are unable to pay for reasonable costs associated with the application for a license or the assembly itself, when those charges for the costs are imposed without regard to the content of speech.

¶ 58. Accordingly, we conclude that the license fee of $100 per application, the insurance requirement, and the bond requirement are reasonable and meet the narrowly tailored standard. However, the County has not shown that the license fee above $100 per applica-

813

tion is reasonably related to administrative costs, and therefore that portion of the fee is invalid.

(f) Sound Restrictions

¶ 59. Masel contends the requirement that the applicant show "[a]ll necessary reasonable precautions to insure that the sound of the assembly will not carry beyond the boundaries of the location of the assembly," SCO § 12.03(2)(*l*), is not narrowly tailored because it is impossible to comply with.[24] Masel also appears to suggest that the County does not have a significant government interest in regulating sound at assemblies in rural areas. He relies on the affidavit of Paul Novitske, who avers that: (1) he has experience organizing and promoting outdoor festivals; (2) it is impossible for some sound not to carry beyond the boundary of an outdoor assembly; and (3) other municipalities regulate sound by specifying decibel levels that may not be exceeded at the boundary.[25] Masel also relies on his own affidavit in which he avers that the only way to make sure that no sound carries beyond the bounds of an assembly between two and four thousand persons is to make the area enclosed so much larger than required

---

[24] The remainder of this provision states that "the use of sound amplification devices shall be prohibited between the hours of twelve o'clock midnight and eight o'clock a.m., except in emergency situations which otherwise require such use." SCO § 12.03(2)(*l*). Masel does not challenge this requirement.

[25] Novitske also offers his opinions on the vagueness and reasonableness of the sound provisions. We disregard these because they are not "such evidentiary facts as would be admissible in evidence." WIS. STAT. § 802.08(3).

for the purposes of the assembly that it would be an unreasonable expense for an assembly such as Weedstock.

¶ 60. We do not agree that the County does not have a significant government interest in regulating sound at assemblies in rural areas. It is well established that government has a substantial interest in protecting its citizens from unwelcome noise, and that applies both to unwelcome noise in one's home and in public places. *Ward*, 491 U.S. at 796. In rural areas, as in towns and cities, there are neighbors who may not welcome the music or other sounds from a nearby assembly. The precautions that are necessary and reasonable to insure that sound does not carry beyond the boundaries of the location of the assembly may vary depending on whether the assembly is in a less populated rural area or a more densely populated city, but the government has a significant interest to protect in both instances.

¶ 61. There is also no question in our view that the requirement that the applicant take "all necessary reasonable precautions to insure that the sound . . . will not carry beyond the boundaries of the location of the assembly" serves the government's interest in a "direct and effective way": as Masel's and Novitske's affidavits show, absent this requirement, large assemblies that feature music will most certainly produce sound that will travel beyond the boundaries of the location of the assembly. *Id.* at 800. Masel proposes alternative kinds of restrictions, such as those referred to in Novitske's affidavit. However, the issue is not whether there are other less restrictive means of achieving the County's interest, but whether the means the County has chosen burden substantially more speech than necessary to achieve the government's interest. *Id.* The affidavits of Masel and Novitske do not create a material factual

dispute on that issue because they assume the ordinance requires that no sound travel beyond the boundaries of the location of the assembly. That is not what the ordinance says: only "*reasonable* necessary precautions" to that end are required. SCO § 12.03(2)(*l*) (emphasis added). The County has chosen not to establish specific allowable decibels, but to specify the goal and require reasonable efforts to meet the goal. If, in spite of the language of the ordinance, the County imposes unreasonable requirements in a particular case, the applicant may seek review of that decision. However, based on the record in this facial challenge, we conclude the County has met its burden of showing that the challenged sound provision is narrowly tailored to serve a significant government interest.

(g) Fence/Boundary Marker, Lighting of Parking Lot, Water Under Pressure, and Hard-Wired Telephone Line

¶ 62. Masel challenges the requirements of a fence as a boundary marking system, SCO § 12.03(2)(a); lighting of parking area, SCO § 12.03(2)(f); water under pressure, SCO § 12.03(2)(c);[26] and a "hard wired" telephone line. SCO § 12.03(2)(h).[27] He contends they do not serve legiti

---

[26] SAUK COUNTY ORDINANCE § 12.03(2)(c) provides:

Separate enclosed toilets for males and females, meeting all state and local specifications, in numbers sufficient to comply with the requirements of Table 55.32, Wis. Admin. Code Chapter COMM 55, conveniently located throughout the grounds, together with an efficient, sanitary means of disposing of waste matter deposited; a supply of running water under pressure and a continuous supply of soap and paper towels shall be provided with each toileting area.

[27] SAUK COUNTY ORDINANCE § 12.03(2)(h) provides:

mate County interests, have the potential of excessively burdening anyone who cannot meet the costs, and provide for no waiver if the applicant is unable to pay for the service.[28]

¶ 63. We have already addressed the issue of a waiver based on inability to pay in the context of the license fee, insurance, and bond, and our conclusion is the same here: if a regulation otherwise meets the standard for narrow tailoring, it need not contain a waiver for those unable to afford the particular requirement when there are adequate alternative avenues of expression. There are in this case, as we explain in the next section.

¶ 64. Considering the fence and the lighting of the parking area,[29] we conclude each serves a significant interest of the County and is narrowly tailored to achieve that interest. The County has a significant interest in keeping participants in large assemblies from spilling out onto the property of others or interfering with the activity of others in public areas, and an "easily recognized boundary system that completely encloses the proposed location" is a reasonable way to

---

A minimum of one hard wired telephone line, that shall be operational during the entire period that the event is being held. The applicant shall include this phone number in the application. Additional wireless communications devices may be used as necessary to ensure that the event operators can contact emergency services at all times.

[28] Masel's affidavit avers that the requirement of a fence and lighting in the parking areas "would impose an expense on Weedstock that, more often than not, could not be born."

[29] *See Supra* note 7.

achieve this goal. A fence—an effective but expensive type of boundary marking system—may be required only when it "is reasonably determined to be necessary to protect the health, safety and welfare of the attendees, the community, and/or neighboring property owners." SCO § 12.03(2)(a). The County also has a significant interest in the safety of persons driving in and out of parking areas at night and of pedestrians and other drivers in those areas; the provision that lighting of these areas, if the assembly occurs during hours of darkness, may be required only "if reasonably necessary to protect public safety" achieves this interest in a direct and effective way and avoids imposing the requirement when not reasonably necessary to do so.

¶ 65. With respect to the requirement of water under pressure, Masel acknowledges that a water supply is necessary but asserts that "pressurized water" is much more expensive than "gravity fed water, which can be brought by truck in enormous quantities." The County responds that "[w]ater in tanks on a truckbed that runs through a spigot by force of gravity is 'under pressure,' i.e. the pressure of gravity." Masel does not reply to this statement in his reply brief. We take Masel's silence in his reply brief as a concession that he does not object to the requirement of pressurized water given the County's construction of that term. *See Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (a proposition asserted by a respondent and not disputed by the appellant's reply is taken as admitted). We therefore construe the requirement of "water under pressure" in SCO § 12.03(2)(c) to include "water in tanks on a truckbed that runs through a spigot by force of gravity" and, based on Masel's implicit concession, we conclude that requirement is narrowly tailored to serve a significant government interest.

¶ 66. Finally, with respect to the requirement for a hard-wired telephone line, Masel points to the County's response to the interrogatory asking whether the requirement in SCO § 12.03(2)(e) that the applicant have a "demonstrated means of contacting local emergency service providers in the event of an emergency that exceeds the capabilities of the on-site medical station" may be satisfied by the "ready availability of several cellular phones." The County responded, "[t]he availability of cellular phones as well as demonstrated ability of the functioning of the cellular phone could satisfy the requirement." However, Masel points out, a hard-wired telephone line is required by SCO § 12.03(2)(h) regardless of the availability of cellular phones with demonstrated functioning ability. In response to a request to state the facts supporting the County's determination that a cellular phone is inadequate to protect the County's interests underlying SCO § 12.03(2)(h), the County stated: "[t]here are areas in Sauk County which do not provide consistent and clear cellular signals and thus, cellular phones are inadequate."

¶ 67. The County argues that the interest served by SCO § 12.03(2)(h) is having a dependable means for summoning emergency services in the event of injury or life-threatening situation. We understand the County's position to be that a hard-wired telephone line is required under SCO § 12.03(2)(h) only when a cellular phone is not available with demonstrated functioning ability at the location of the assembly. We accept this limiting construction of SCO § 12.03(2)(h) and, as construed, we conclude it is narrowly tailored to serve a significant government interest.

3. Ample Alternatives for Communication

¶ 68. Masel contends the ordinance does not allow adequate alternative avenues for large assemblies in Sauk County. The premise of his argument appears to be that the only adequate alternatives are assemblies of the same size and duration that are regulated by the ordinance. However, no case brought to our attention has construed the "ample alternatives" requirement this strictly.[30] Instead, cases recognize that the requirement may be satisfied even if the alternative channels of communication may be less effective than one would prefer. *See, e.g., Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1319–20 (11th Cir. 2000) (requirement for alternatives are met when group can hold a political demonstration and concert in the park without a permit and without the structures, lighting, and other benefits conferred by a festival permit, even though those benefits increase the efficiency of the communication of the message).

■

¶ 69. Because this ordinance governs assemblies only when there are more than 1000 people and only when they continue for eighteen or more consecutive hours, groups of less than 1000 may assemble on public or private property for more than eighteen hours, and larger groups may assemble for any number of days as long as they spend nights in motels, campgrounds, or private homes. In addition, since the ordinance does not

---

[30] We do agree with Masel that the relevant inquiry is whether there are ample alternative channels for communication in Sauk County, not in some other part of the state. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556–57 (1975); *University Books and Videos Inc. v. Metropolitan Dade County*, 33 F. Supp. 2d 1364, 1371 n.8 (S.D. Fla. 1999).

apply to permanently established places of assembly, *see* SCO 12.02(6), Masel and others may arrange for use of a permanent place of assembly. Finally, the record shows one alternative that has actually been used by a group that apparently desired to protest the dispersal of Weedstock pursuant to the trial court order in this case: this group, the Friends of the First Amendment, obtained approval to assemble on the courthouse square in Baraboo for four Sundays for music and speeches. We are satisfied that the ordinance is sufficiently narrow to leave ample alternative means for individuals and groups to communicate their messages at assemblies.

## II. Equal Protection

¶ 70. Masel contends that the provision exempting "government . . . sponsored fairs such as are held on regularly established fairgrounds," SCO § 12.02(7), violates the equal protection clause because it discriminates based on viewpoint but does not meet the standard of strict scrutiny applicable to such discrimination. There is no merit to this argument. The distinction in this provision is not content-based; it is not based on the message of the assembly but on the location. Therefore, none of the cases Masel relies on support his position. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 (1992) (ordinance prohibiting hate speech); *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987) (content-based approach to taxation of magazines); *Carey v. Brown*, 447 U.S. 455, 463 (1980); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95

(1972) (in both cases, distinguishing between lawful and unlawful ticketing based on content of placards).[31]

## III. Indemnification and Hold Harmless

¶ 71. SAUK COUNTY ORDINANCE § 12.02(8)(a) requires an applicant to execute and file an "agreement which shall indemnify and hold harmless this County or any of its agents, officers, servants and employees from any liability or causes of action which might arise by reason of granting this license." The form on the application that an applicant must sign states:

> The undersigned applicant hereby acknowledges that Sauk County is serving solely as a licensing agent, and is exercising its legitimate, governmental powers. Sauk County is not endorsing or sponsoring this assembly and is not in any way involved in organizing, conducting or arranging the contemplated assembly. The applicant hereby agrees to hold Sauk County, its elected officials, employees and agents, harmless from any and all claims, demands, suits or causes of action of whatsoever nature which might be brought by third parties arising from the negligence of the applicant or by reason of Sauk County's approval or disapproval of this application or the granting of a license. Should any suit be brought against Sauk County arising from the negligence of the applicant or by reason of Sauk County's approval or disapproval of this application or the granting of a license, the applicant agrees to defend and indemnify Sauk County to the maximum extent

---

[31] Masel does not contend that the exemption in SCO § 12.02(7) fails to meet the requirement that it bear a rational relationship to a legitimate government interest—a less exacting standard under the equal protection clause and the one we conclude is applicable here. *See State v. Lindsey*, 203 Wis. 2d 423, 444, 554 N.W.2d 215 (Ct. App. 1996).

permitted by law to include the payment of any judgment, actual attorneys fees, disbursements and costs of any action.

Masel contends that the requirement that this form be signed is unconstitutional because it conditions the applicant's exercise of First Amendment rights on the relinquishment of another constitutional right—the right to sue the County over issues relating to the constitutionality of the ordinance. Masel reads the first sentence of the form as an acknowledgment by the applicant that the County is acting constitutionally and the ordinance is constitutional. He reads the third sentence following "or by reason of" and the fourth sentence to apply not only to claims by third parties against the County, but to claims by the applicant against the County, including claims that the County's conduct in granting or denying a license is unconstitutional.

¶ 72. We agree with the County that neither of these constructions is reasonable when the form is read in its entirety and together with the ordinance provision it implements. The first sentence when read together with the second sentence plainly means that Sauk County is licensing the assembly if it meets the criteria of the ordinance the County has enacted, but the County is not involved in organizing, conducting, or arranging the assembly. The portion of the third sentence after "or by reason of" and the fourth sentence must be read together with the beginning of the third sentence, which makes clear that the agreement is addressing claims by third parties, not claims by the applicant. Correctly read, the form does not require an applicant to relinquish the right to sue the County.

## IV. Penalties

¶ 73. The ordinance provides that anyone who conducts the activities specified in SCO § 12.02(1) without a license or who violates any condition upon which a license is granted "may be fined not less than $1,000.00 or more than $10,000.00 for each violation. Each day of violation shall be considered a separate offense." SCO § 12.07(3). Masel contends this penalty is so severe that it is a criminal penalty, not a civil penalty, and therefore unconstitutional because the ordinance does not confer the procedural protections to which criminal defendants are entitled under the Fifth and Sixth Amendments to the United States Constitution.

■■■■

¶ 74. The parties agree on the test we are to apply to determine whether a legislative act is civil or criminal. As recently articulated in *State v. Rachel*, 2002 WI 81, ¶¶ 32, 42–43, 254 Wis. 2d 215, 647 N.W.2d 762, we first determine whether the legislative body either expressly or implicitly indicated that the law was intended to be criminal or civil. This presents an issue of statutory construction. *Id.*, ¶ 32. If we determine that the intent was to create a civil law, we next determine whether the sanction imposed is "so punitive in form and effect as to render [the law] criminal" despite the legislative intent. *Id.*, ¶ 42. The factors we apply in this second determination are: (1) [w]hether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to

which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned. *Id.*, ¶ 43, citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963).

██

¶ 75. We conclude the ordinance was intended to be civil in nature. The plain language of the ordinance states that its purpose is to:

> regulate the assemblage of large numbers of people, in excess of those normally needing the health, sanitary, fire, police, transportation and utility services regularly provided in this County, in order that the public peace and good order, the health, safety and welfare of all persons in this County . . . may be protected.

SCO § 12.01(1). Nothing in the ordinance indicates a contrary intent. With respect to the factors that determine whether the penalties nonetheless render the ordinance criminal, Masel does not refer to them specifically and does not apply them in his argument. We are unable to understand why, since he appears to recognize that *Rachel*, as the most recent supreme court decision on this issue, articulates the test we are to apply. In any case, because Masel does not present a developed argument applying the relevant factors, we decline to analyze this issue further. We conclude the county board intended the ordinance to be civil in nature and Masel has not persuaded us the penalties render it criminal under the applicable standard.

¶ 76. Masel also argues this penalty violates the Eighth Amendment proscription against cruel and unusual punishment. However, the cases he cites address criminal statutes and punitive sanctions. Because Ma-

sel has not succeeded on his argument that the ordinance is criminal, these cases are not applicable.

## SEVERABILITY AND CONCLUSION

¶ 77. In summary, we have decided that Masel's challenges to the constitutionality of the ordinance do not succeed except those respecting the following provisions: the sixty-day advance filing requirement, SCO §§ 12.02(1) and 12.04(1); the forty-five-day processing time period, SCO § 12.05; the prohibition against advertising, promoting, and selling tickets before a license is issued, SCO § 12.02(1); the requirement of the zoning administrator's certification, SCO § 12.02(8)(b); and the license fee in excess of $100 per application, SCO § 12.02(3). As to these, we have concluded that, based on the record before us, there are no disputed issues of fact and Masel is entitled to judgment as a matter of law that these provisions do not meet the requirement that they be narrowly tailored to achieve a significant government interest.

¶ 78. Because the ordinance has a severability provision,[32] the County asserts that any provision we determine to be unconstitutional can be removed without affecting the remainder. The County is correct that the existence of a severability clause is entitled to great weight in deciding whether the legislative body in-

---

[32] SAUK COUNTY ORDINANCE § 12.01(2) provides:

It is the intent of the Sauk County Board of Supervisors that all sections and provisions of this ordinance have an independent existence, and, should any section or provision be declared invalid or unconstitutional by a court of competent jurisdiction, it is the intent of the Board of Supervisors that any section or provision so declared shall be severable from and shall not affect the validity of the remainder of this ordinance.

tended that the portions not invalidated remain as an effective ordinance. *Town of Clearfield v. Cushman*, 150 Wis. 2d 10, 24, 440 N.W.2d 777 (1989). However, the remaining ordinance must be a valid enactment independent of the invalid severed portions. *Id.* at 23–24. We must therefore consider whether the ordinance remaining after severance of the invalid provisions meets the applicable First Amendment standards. We conclude that severance of the provisions concerning the sixty-day advance filing requirement, the prohibition against advertising, promotion, and selling tickets before a license is issued, the zoning administrator's certification, and the license fee over $100 per application do not affect the constitutionality of the remaining provisions of the ordinance. There is no requirement in First Amendment jurisprudence that a valid time, place, and manner regulation have any of these types of provisions.

¶ 79. However, we reach a different conclusion regarding the forty-five-day processing time. If this provision is severed, the County has unfettered discretion in deciding when to make a decision on an application. The Court in *Thomas* referred to the processing time specified in that ordinance as one of the specific provisions that satisfied the *Forsyth* requirement of definite standards to guide the official. 534 U.S. at 324.[33] Without a specified time within which the

___

[33] We recognize that one of the procedural requirements in *Freedman v. Maryland*, 380 U.S. 51, 59 (1965), involves a time limit for acting on an application in that there must be a specified time period within which the government must either issue a license or go to court. In *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 802 (1988), the

County must either grant or deny a license, nothing in the ordinance prevents an official from "encouraging some views and discouraging others through the arbitrary [action]," *Forsyth*, 505 U.S. at 133, in this case, by acting speedily on some applications and indefinitely postponing action on others.

¶ 80. Accordingly, we conclude the entire ordinance is unconstitutional because the forty-five-day processing time is invalid as a violation of the First Amendment. For this reason, we reverse the trial court's summary judgment dismissing Masel's counterclaim in paragraph 202, and we reverse its order permanently enjoining Masel from holding Weedstock without a license under the ordinance. We affirm the trial court's order dismissing Masel's counterclaims in paragraphs 201 and 203–07. We remand with instructions to enter summary judgment in favor of Masel on

Supreme Court relied on this portion of *Freedman* to invalidate a licensing system for soliciting funds for charitable purposes on the ground that it did not contain a time limit within which a determination on a license had to be made. Prior to *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), lower courts relied on either *Riley* or *Freedman* in requiring a time limit for processing applications for parade or similar permits. *See, e.g., MacDonald v. Safir*, 26 F. Supp. 2d 664, 667 (S.D.N.Y. 1998); *Beal v. Stern*, 184 F.3d 117, 127–29 (2nd Cir. 1999). As we have explained earlier in this decision, *Thomas* held that the *Freedman* procedural safeguards did not apply to a content-neutral time, place, and manner permit system regulating speech in city parks. 534 U.S. at 322–23. We are not relying on *Freedman* to reach our conclusion that this ordinance must contain a time limit within which the County must make a decision on an application, but on the *Forsyth* requirement, applied in *Thomas*, that the ordinance may not delegate overly broad discretion to the licensing authority.

the counterclaim in paragraph 202, to dismiss the complaint against Masel, and to conduct further proceedings as appropriate.

*By the Court.*—Judgment and order reversed and cause remanded with directions.