STATE of Wisconsin,
Plaintiff-Appellant,

v.

Michael W. CRUTE,
Defendant-Respondent.

Court of Appeals

*No. 2014AP659. Submitted on briefs September 16, 2014.
—Decided January 29, 2015.*

2015 WI App 15

(Also reported in 860 N.W.2d 284.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Winn S. Collins*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Jeff Scott Olson* of *The Jeff Scott Olson Law Firm, S.C.*, Madison.

Before Lundsten, Sherman and Kloppenburg, JJ.

¶ 1. KLOPPENBURG, J.[1] The circuit court dismissed a citation, issued to Michael Crute under Wis. Admin. Code § Adm 2.14(2)(vm)5., for participating in an unpermitted sing-along in the State Capitol rotunda.[2] The circuit court concluded that the rule was unconstitutional. According to the circuit court, the rule "violates the First Amendment because it applies, on its face, to very small groups [and] is therefore not narrowly tailored to address the legitimate interests of the government in requiring a permit." The State appeals and argues that the circuit court erred in dismissing the citation because: (1) Crute did not satisfy his initial burden of showing that the rule implicated the First Amendment; and (2) the court erroneously failed to narrowly construe the rule so as to avoid constitutional infirmity. For the reasons set forth below, we conclude that the State fails to demonstrate that the circuit court erred, and, therefore, we affirm.

## BACKGROUND

¶ 2. The pertinent facts of this case are undisputed. For some time leading up to the date of the citation, various individuals engaged in a noontime sing-along in the Wisconsin State Capitol rotunda. This became known as the Solidarity Sing-Along, a form of protest against recent legislation. On July 24, 2013,

---

[1] This appeal was converted from a one-judge appeal to a three-judge appeal under Wis. Stat. Rule 809.41(3) (2011–12).

[2] We often refer to Wis. Admin. Code § Adm 2.14(2)(vm)5. simply as "the rule" in this opinion.

Michael Crute participated in the Solidarity Sing-Along in the rotunda. The Capitol Police issued Crute a citation for participating in an unpermitted event, in violation of WIS. ADMIN. CODE § Adm 2.14(2)(vm)5.[3] Crute filed a motion to dismiss the citation, claiming that the permit scheme created by the rule was facially unconstitutional under the First Amendment. Crute's principal argument was that the regulation was not a valid time, place, and manner regulation because it was not narrowly tailored to serve a substantial governmental interest. In particular, Crute argued that the rule did not specify a numerical floor for the group size that would trigger the permit requirement, and therefore, the rule unconstitutionally required a permit even for very small groups of individuals. The circuit court granted Crute's motion to dismiss the citation.

## DISCUSSION

██

¶ 3. The constitutionality of a statute is a question of law, which we review de novo, benefiting from the analysis of the circuit court. *State v. Trochinski*, 2002 WI 56, ¶ 33, 253 Wis. 2d 38, 644 N.W.2d 891. On appeal, the State argues that the circuit court erred in two respects: (1) placing the burden of proving the rule's constitutionality on the State even though Crute did not first satisfy his initial burden of showing that the rule implicated the First Amendment; and (2) failing to save the rule with a narrowing construction so as to avoid constitutional infirmity. We first review the rule and general principles pertaining to the First Amend-

---

[3] Crute was originally charged under WIS. ADMIN. CODE § Adm 2.14(2)(v). The State moved to amend the citation to charge Crute under § Adm 2.14(2)(vm)5. Crute did not oppose the motion. In this opinion, we address only § Adm 2.14(2)(vm)5.

ment and burden of proof. We then address and reject each of the State's arguments in the sections that follow.

### A. *Chapter Adm 2: The Permit Scheme*

¶ 4. The rule at stake here is an emergency rule issued by the Department of Administration in April 2013, modifying Wis. Admin. Code ch. Adm 2 relating to the use of state facilities.[4] The provision in the emergency rule pertinent to this appeal authorized the Department to impose a civil forfeiture on individuals who participate in or spectate at any unpermitted "event" in state buildings and facilities:

> (2) In order to preserve the order which is necessary for the enjoyment of freedom by occupants of the buildings and facilities, and in order to prevent activities which physically obstruct access to department lands and buildings or prevent the state from carrying on its instructional, research, public service, or administrative functions, and pursuant to s. 16.846, Stats., whoever does any of the following shall be subject to a forfeiture of not more than $500:
>
> . . . .
>
> (vm) Any participant or spectator within a group constituting an unlawful assembly, who intentionally fails or refuses to withdraw from the assembly after it has been declared unlawful, shall be subject to the penalties identified in sub. (2) (intro.). Any event may be declared unlawful if its participants:
>
> . . . .
>
> 5. Enter or occupy any building or facility managed or leased by the department, without authorization.

Wis. Admin. Code § Adm 2.14(2)(vm).

---

[4] The emergency rule expired on September 13, 2013. In this opinion, references to Wis. Admin. Code ch. Adm 2 are to the emergency rule that was in effect when the Capitol police issued Crute's citation.

¶ 5. A separate provision in the emergency rule defined "event" as: "any performance, ceremony, presentation, meeting, rally, organized tours not led by department or legislative staff or officials, festival, reception or the like held in public areas of state facilities or buildings." WIS. ADMIN. CODE § Adm 2.03(3m).

¶ 6. Another part of the emergency rule authorized the Department to issue permits for events in state buildings and facilities, and required that permit applicants "complete a written application to the department at least 72 hours in advance of the anticipated" event. WIS. ADMIN. CODE § Adm 2.04(1) and (2).[5]

¶ 7. As to WIS. ADMIN. CODE § Adm 2.14(2)(vm)5., the rule at issue here, we understand the parties to agree that the "assembly," "event," and "without authorization" language imposed a permit requirement on events held in public areas of state buildings, including the Wisconsin State Capitol rotunda. Persons attending unpermitted events, as participants or spectators, could be cited and compelled to pay a forfeiture. We discern no

---

[5] The Department also issued a revised Access Policy in April 2013, pursuant to WIS. ADMIN. CODE § Adm 2.04(1m) of the emergency rule, which provided guidance as to the application of the chapter to individual buildings and facilities, including the interior public areas of the Capitol. The Access Policy provided:

> The following conditions governing the use of the public areas of the Capitol apply specifically to general public use of the **interior** of the Capitol:
>
> . . . .
>
> Permits are required for any rally consisting of four (4) or more persons occurring inside the Capitol, unless the event is a *bona fide* spontaneous event.

THE ACCESS POLICY § III (alteration in original). The parties cite this language but do not explain its significance to any disputed issue. Therefore, we do not address the Access Policy further.

argument that the term "assembly" had independent meaning from the word "event." As noted, "event" broadly included "any performance, ceremony, presentation, meeting, rally, organized tours, . . . festival, reception or the like." WIS. ADMIN. CODE § Adm 2.03(3m).

¶ 8. There is also no dispute that, on its face, the rule did not contain a numerical floor and, therefore, without a limiting construction, the rule prohibited unpermitted events undertaken by as few as one person.[6] The State does not defend the rule insofar as it applied to very small groups. Indeed, we understand the State to implicitly concede that requiring a permit for very small groups is unconstitutional. Rather, the State bases its merits argument on the contention that the rule may be saved by reading into the rule a specific numerical enforcement floor of 21, below which the State could not require a permit. We address that contention in section D below.

¶ 9. Finally, before moving on we observe an apparent quirk in the parties' arguments. The rule at issue appears to be a rule that applied generally to all state buildings and facilities. However, the parties discuss the rule as it applied to the public areas of a single and unique building, the State Capitol. The difference between the public areas of the State Capitol and public areas in smaller and different state buildings would seemingly affect the reasonableness of

---

[6] Crute notes that the rule appeared to require a permit for an event involving only one person, because a single person can perform or demonstrate without others, but that the penalty might not be triggered until the event "attracts one or more spectators." The State notes only that the rule did not contain any minimum number of persons at an event to trigger the permit requirement. While it might be argued that the rule could be enforced against only one person, whether the minimum number was one or two does not affect our analysis.

imposing a permit requirement on very small groups. However, because the parties ignore applications to other public areas, we do the same.

*B. Speech Protected by the First Amendment and the Burden of Proof in First Amendment Cases*

■

¶ 10. "The First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.'" *State v. Hemmingway*, 2012 WI App 133, ¶ 10, 345 Wis. 2d 297, 825 N.W.2d 303 (quoted source omitted). The United States Supreme Court "ha[s] long recognized that [the First Amendment's] protection does not end at the spoken or written word" and "ha[s] acknowledged that conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the [First Amendment].'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoted sources omitted). "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [courts] have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoted source omitted). "In determining whether expressive conduct is at issue . . ., we [look to] whether the activity in question is commonly associated with expression." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 769 (1988).

■■

¶ 11. Generally, statutes are afforded a presumption of constitutionality that the challenger must refute. *State v. Robert T.*, 2008 WI App 22, ¶ 5, 307

Wis. 2d 488, 746 N.W.2d 564. But, when a statute infringes upon First Amendment rights, " 'the State bears the burden of proving the statute constitutional beyond a reasonable doubt.' " *Id.* (quoted source omitted). "It is, nevertheless, the initial duty of the person who claims the protection of the First Amendment to demonstrate that the [regulated] conduct is speech or its equivalent, to which First Amendment protections apply." *City of Madison v. Baumann*, 162 Wis. 2d 660, 669, 470 N.W.2d 296 (1991).

¶ 12. With these general principles in mind, we turn our attention to the State's arguments on appeal.

### C. Whether the Circuit Court Improperly Imposed the Burden of Proving the Rule's Constitutionality on the State

¶ 13. As noted above, the State first argues that the circuit court erred by placing the burden of proving the rule's constitutionality on the State without first requiring Crute to satisfy his initial burden of showing that the rule implicated the First Amendment. As explained in the subsections below, we reject the State's argument for two reasons: (1) the State forfeited the argument by effectively conceding before the circuit court that the rule implicated the First Amendment; and (2) the State's alternative argument—that Crute could not, regardless of effort or circuit court action, have met his initial burden—is not persuasive.

### 1. Forfeiture / Concession

¶ 14. Crute argues that the State effectively conceded before the circuit court that the rule implicated

the First Amendment, and that the burden, therefore, shifted to the State to prove the rule constitutional. We agree.

¶ 15. At the pretrial hearing, Crute put the State and court on notice that he would be moving to dismiss the citation "on 1st Amendment grounds." In his brief in support of his motion to dismiss, he stated, "Because of the First Amendment context in which this case is brought, the burden of proof is on the State." In that same brief, Crute plainly asserted that the rule implicated protected speech. He referred to the rule's restriction of "expressive activity of individuals acting alone, not just groups," to the rule's requiring "an individual to have a permit if he or she wants [to] demonstrate anywhere in the Capitol," and to the rule's requiring permits from "groups as small as a single individual who wishes to sing a song or recite a poem, or read aloud the free speech guarantee of the Wisconsin Constitution."

¶ 16. In its brief opposing Crute's motion, the State did not contest "the First Amendment context" asserted by Crute, or argue in any way that the rule did not implicate the First Amendment. Rather, the State set forth the uncontested law that the State has the burden of proving that a statute is constitutional "when [the] statute implicates the exercise of First Amendment rights." The State then proceeded to state that it was "offer[ing] evidence" to meet that burden. We find nothing in the State's written response suggesting that the State contested the proposition that enforcement of a rule imposing a permit requirement on persons wishing to participate in rallies or other events in public buildings does not implicate the First Amendment.

¶ 17. Nor during oral argument before the circuit court on Crute's motion to dismiss, did the State

contest that the rule implicated the First Amendment, and that, therefore, the burden of proof was on the State. Indeed, at one point counsel for the State agreed with the circuit court that the burden was on the State:

> THE COURT: Do you continue to adhere to that belief, that the burden is on the State to prove beyond a reasonable doubt the constitutionality of the rule?
>
> [THE STATE]: As noted on page 4 of the brief, yes.

¶ 18. On appeal, the State would have us interpret this exchange differently, based on the part of its answer that references page 4 of its circuit court brief. The State asserts that this reference to its brief was a reference to "a general summary of the burden-shifting approach found within First Amendment cases." The State seems to argue that its reference to "page 4" in its response to the circuit court's question should have alerted the court that the State was taking the position that Crute did not meet his initial burden in the referenced burden-shifting scheme. We are not persuaded. First, a mere reference to general case law does not communicate a dispute. More importantly, the State's argument ignores the "yes" part of its response. The State offers no reason why we should not give the "yes" part of its answer its normal meaning—here, an affirmation that the State had the burden.

### 2. Initial Burden to Show that the Rule Implicated the First Amendment

██

¶ 19. We turn to the State's alternative argument that, regardless of the circuit court's failure to require Crute to meet his initial burden, Crute could not have

met this burden because he could not have shown that the rule implicated the First Amendment. In this respect, the State attempts to persuade us that the rule on its face implicated unprotected conduct only. Our review of the record reveals that this argument is made for the first time on appeal. The State did not argue to the circuit court that the rule regulated only unprotected conduct. Thus, we deem the conduct-only argument forfeited and reject it on that basis. *See Bank of America NA v. Neis*, 2013 WI App 89, ¶ 53, 349 Wis. 2d 461, 835 N.W.2d 527 (argument not raised in the circuit court is forfeited on appeal).

¶ 20. We note that even if we addressed the merits of the State's conduct-only argument, it does not appear to have merit. Beyond the mere assertion that the rule implicated unprotected conduct only, we discern little support for that assertion in the State's argument. The State does not dispute that the rule could be applied to penalize unpermitted protests. The State does not suggest a reason why the types of events specified in the rule do not readily lend themselves to protected expressive conduct. The State does not cite any definitional or legal authority for the proposition that such activities as public assemblies, gatherings, meetings, or the examples the State itself lists, namely a "public address, award ceremony, veteran memorial, . . . and sing-along," are, "[o]n [their] face," not activities "commonly associated with expression." *See City of Lakewood*, 486 U.S. at 769.

¶ 21. Confusingly, while asserting that the rule implicated unprotected conduct only, the State simultaneously seems to accept the proposition that the activities regulated by the rule often involve protected speech. For example, the State's appellate brief argues that while "some forms of expressive conduct may

442

include speech . . . [the rule] applie[d] regardless of an event's message." Thus, the State seemingly concedes the obvious, that the activities regulated by the rule included protected activities. If the State means to argue that a rule does not implicate the First Amendment if the rule applies regardless of the message intended to be conveyed by participants, the State provides no support for that proposition.

¶ 22. In sum, we conclude that the State has forfeited both its argument that the circuit court improperly failed to require Crute to meet his initial burden of showing that the rule implicated the First Amendment, and its argument that Crute could not have met that burden because the rule implicated unprotected conduct only. Under the circumstances, the court properly placed the burden on the State to demonstrate the rule's constitutionality.

### D. Narrowing Construction of the Rule

██

¶ 23. In considering a facial challenge to a regulation, "if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *See Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 397 (1988). Courts have a duty to construe regulations "so as to render them constitutional whenever possible." *See State v. Dronso,* 90 Wis. 2d 110, 115, 279 N.W.2d 710 (Ct. App. 1979).

¶ 24. Here, the parties dispute whether the rule was "narrowly tailored" within the meaning of First Amendment law.[7] At the same time, no one argues that

_____

[7] While Crute has confined his argument to challenging the rule because it was a time, place, and manner restriction not narrowly tailored to a significant government interest, he sug-

443

the rule as written was narrowly tailored. Rather, the real dispute is over whether the rule was amenable to a narrowly tailored interpretation that would "render [it] constitutional." *See id.* More specifically, the State concedes that the rule was not narrowly tailored absent a numerical floor that prevented application of the rule to very small groups. In the State's view, the circuit court should have read, and this court may now read, a numerical floor for enforcement of the permit requirement into the rule. That numerical floor, the State argues, is 21, such that groups involving 20 or fewer persons would not be required to possess a permit. We are not persuaded.

¶ 25. We first summarize the time, place, and manner test on which the parties focus and then further explain the part of that test at issue here. We then reject the three reasons the State gives to support its view that we may save the rule by reading into it a specific numerical floor.

¶ 26. Generally, a "government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally .... Such a scheme, however, must meet certain constitutional requirements." *Forsyth Cnty. v. The Nationalist Movement*, 505 U.S. 123, 130 (1992). In particular, a permit scheme controlling the time, place, and manner of speech is subject to a three-prong test: (1) it must be content-neutral; (2) it

gests in passing on appeal that such a challenge "is indistinguishable, in the present context, from" a claim that the rule was overbroad. Crute does not develop an argument that the rule was unconstitutionally overbroad, and the State expressly requests that this court not address overbreadth. Accordingly, we confine our analysis to the issue argued, whether the rule was a narrowly tailored time, place, and manner restriction.

must be "narrowly tailored to serve a significant governmental interest"; and (3) it must "leave open ample alternatives for communication." *Id.*; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying the same three-prong test to restrictions on the time, place, and manner of protected speech).

¶ 27. As to the first and third prongs of the test above, the parties agree that the rule here was content-neutral and left ample alternative channels for communication.

¶ 28. As to the second prong of the test, the parties are in agreement with regards to the "significant government interests" aspect of this prong. More specifically, the parties appear to agree that the State's significant interest here was managing competing demands for public space and limiting "events" so that they did not interfere either with specially planned activities at the Capitol, such as Red Cross blood drives and holiday celebrations, or with normal daily uses of the Capitol such as general public tours and legislative committee meetings and sessions.

¶ 29. However, the parties disagree as to the "narrowly tailored" aspect of the second prong. Specifically, they disagree over whether a court may read into the rule a specific numerical floor so that the rule would be narrowly tailored. Thus, we focus our attention on the part of the second prong requiring that such a permit scheme be "narrowly tailored."

¶ 30. A time, place, and manner regulation of expressive activity is considered narrowly tailored so long as it " 'promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward*, 491 U.S. at 799 (quoted source omitted). The regulation need not be "the least restrictive or least

intrusive means." *Id.* at 798. However, "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799.

¶ 31. The State did not in the circuit court, and does not on appeal, argue that the rule as worded, without any minimum number of persons required to trigger the permit requirement and forfeiture authority, was constitutional. To the contrary, the State agreed in the circuit court that "the only way that this rule can be sustained . . . is to graft onto the rule" a numerical floor.

¶ 32. The circuit court found that "the state does not dispute the premise that the rule cannot be constitutionally applied to very small groups." The circuit court then referred to the reasoning of the district court in *Kissick v. Huebsch*, 956 F. Supp. 2d 981 (W.D. Wis. 2013),[8] suggesting that small groups do not interfere with the normal use of the Capitol in the same way that large groups do. The circuit court further stated that, in light of *Kissick*, "the rule *is* unconstitutional on its face" but the constitutional problem could be solved if the rule was "amended to provide a reasonable numerical floor." The State does not challenge these statements. Rather, the State argues that the circuit court erred by not reading into the rule a specific numerical floor.

[8] In *Kissick v. Huebsch*, 956 F. Supp. 2d 981 (W.D. Wis. 2013), the plaintiff challenged the permit requirement in the rule as violative of his First Amendment rights. The federal district court enjoined the Department from enforcing the permit requirement in the rule as "to gatherings within the Capitol that are anticipated to attract 20 or fewer persons." *Id.* at 1007. We discuss this decision in greater detail below.

¶ 33. To sum up, we understand the parties to agree that events involving large numbers of people have the potential for interference with normal uses of the Capitol and, thus, a permit requirement is constitutional when applied to such events, however defined. Conversely, the parties agree that events involving small numbers of people do not typically interfere with normal uses of the Capitol and, thus, the State may not, consistent with the Constitution, require small groups to obtain a permit.[9] Although the parties agree that the rule must have a numerical floor that exempts

---

[9] Consistent with the parties' agreement as to these legal propositions, our research has identified numerous cases in which courts have struck down permit schemes that had no numerical floor or that specified that they applied to a single individual or to an identified small number of people. See for example:

*Cox v. City of Charleston, SC*, 416 F.3d 281, 285–86 (4th Cir. 2005) (holding that the "unflinching application of the [permit scheme] to groups as small as two or three renders it constitutionally infirm" and explicitly declining an "invitation to announce a numerical floor below which a permit requirement cannot apply" because the "relevant legislative body . . . is the proper forum for balancing the multitude of factors to be considered");

*American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) (holding that permit requirement applied to groups as small as two persons and was, therefore, "not narrowly tailored");

*Grossman v. City of Portland*, 33 F.3d 1200, 1206–08 (9th Cir. 1994) (stating that permit requirement may be justified for large groups, where burden placed on government is more substantial, and suggesting that ordinance that could apply to "single protestors" and did in fact apply to "six to eight people carrying signs in a public park" was not narrowly tailored);

*Douglas v. Brownell*, 88 F.3d 1511, 1514, 1524 (8th Cir. 1996) (holding that parade permit requirement, which defined

small groups from the permit requirement, they disagree as to whether there exists a basis for a court to read into the rule a numerical floor. Stated differently, with respect to the second prong, the parties dispute whether the rule may be read as having a numerical floor, such that the rule was "narrowly tailored" to serve the State's interest in requiring large groups to obtain a permit.

¶ 34. As to the insertion of a numerical floor, the State presents three arguments why the circuit court here could have selected a specific numerical floor: (1) there was textual support in the rule for a specific number; (2) the circuit court could have selected 21 as a numerical floor by following the example of the district court in *Kissick*; and (3) the circuit court could have selected 21 as a numerical floor by looking to the Department's response to the *Kissick* decision as the Department's "own limiting interpretation and implementation."[10] We address and reject each of these contentions below.

parade as " 'any march or procession of ten (10) or more persons,' " was not narrowly tailored);

*Berger v. City of Seattle*, 569 F.3d 1029, 1048 (9th Cir. 2009) (holding that permit provision requiring "single individuals to inform the government of their intent to engage in expressive activity in a public forum" was not a reasonable time, place, or manner restriction).

[10] In its reply brief on appeal, the State suggests 13 as the numerical floor that the court could read into the rule, based on the settlement reached in *Kissick*. *See infra* note 11. We reject this belated suggestion because it is made for the first time in the reply brief on appeal. *See Schaeffer v. State Personnel Comm'n*, 150 Wis. 2d 132, 144, 441 N.W.2d 292 (Ct. App. 1989) ("We will not, as a general rule, consider arguments raised for the first time in a reply brief . . . ."). Moreover, the suggestion would also fail for the reasons stated in the subsections that follow.

### 1. Finding Textual Support

¶ 35. The State argues that the term "assembly" in the rule provided a textual anchor for a narrowing construction. We conclude that this argument is without merit.

¶ 36. The State presents a dictionary definition of "assembly" as the "coming together of a number of persons." Nothing in that definition specifies a "number" and, thus, nothing in the definition supports a court's inserting a specific number into the rule. It follows that the State's argument based on the term "assembly" does not supply a basis for selecting a specific number as a narrowing construction of the rule. *See State v. Zarnke*, 224 Wis. 2d 116, 139, 589 N.W.2d 370 (1999) (" 'While a statute should be held valid whenever by any fair interpretation it may be construed to serve a constitutional purpose, courts cannot go beyond the province of legitimate construction to save it, and where the meaning is plain, words cannot be read into it or out of it for the purpose of saving one or other possible alternative.' " (quoted source omitted)); *see also Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987) (refusing to adopt limiting construction where "the words of the resolution simply leave no room for a narrowing construction").

### 2. Following the Kissick Example

¶ 37. We understand the State to argue that the circuit court could have followed the example of the federal district court in *Kissick* and, like that court, could have selected 21 as a numerical floor. This argument is based on a misunderstanding of the *Kissick* opinion and order. As we proceed to explain, the court in *Kissick* did not engage in construing the rule

449

to save it. Rather, the court provided temporary injunctive relief pending litigation of the merits of the constitutional challenge to the rule.

¶ 38. *Kissick* is a federal district court opinion and order—issued sixteen days before Crute's citation—prohibiting enforcement of the emergency rule at issue in this case to groups anticipated to attract 20 or fewer persons in the Capitol. Kissick was an individual who wanted "to participate occasionally in . . . the 'Solidarity Sing Along.' " *Kissick*, 956 F. Supp. 2d at 984. Kissick felt "vulnerable to being cited" because "Sing Along participants have resisted characterization as an 'organized group' or 'organization' . . . and, therefore, have declined to designate anyone to obtain a permit." *Id.* Kissick claimed that the permit requirement in the emergency rule infringed upon his First Amendment rights under the United States Constitution and asked the district court to issue a preliminary injunction barring the Department from enforcing the permit requirement. *Id.*

¶ 39. In seeking a preliminary injunction, Kissick had the burden to " 'establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.' " *Id.* at 991 (quoted source omitted). One of Kissick's arguments was that the permit scheme was an unconstitutional regulation of the time, place, and manner of protected speech, because it was not narrowly tailored to serve a significant governmental interest. *Id.* at 1000. The district court concluded that Kissick met the burden for seeking a preliminary injunction and reasoned:

> [The] permitting requirement sweeps in an enormous amount of ordinary activities that are unlikely to

present any significant disturbance in the Capitol [and] thus unnecessarily creates a chilling effect on the speech of the majority of individuals who *are* willing to follow reasonable conduct standards and co-exist harmoniously with tour groups, permitted events and other legitimate state activities . . . .

. . . Accordingly, the court finds that the state *does* have a significant interest in requiring an advance permit for *every* event that can reasonably be expected to attract large crowds. At the same time, the [one-person] permitting requirement currently in place [is] plainly not narrowly tailored to address that interest.

*Id.* at 1004 (alterations in original).

¶ 40. Having concluded that Kissick had "a fairly strong likelihood of success on the merits of his claim," the district court balanced the harm to Kissick if there was no injunction and the injury that an injunction would cause the Department. *Id.* at 1006. The court noted that it had the option of "enjoin[ing] enforcement of the entire Policy until the Department arrives at an appropriate [numerical floor]," but because the court's finding was not a "final judgment of facial unconstitutionality, and [the Department] established that some threshold is appropriate," the court decided to "enjoin [the Department] from enforcing . . . the permitting requirement generally, as . . . to gatherings within the Capitol that are anticipated to attract 20 or fewer persons." *Id.* at 1007.[11]

---

[11] As in this case, the parties and the district court in *Kissick* addressed the Wis. Admin. Code ch. Adm 2 permitting scheme as applied to the Capitol only. *See Kissick*, 956 F. Supp. 2d at 984–85. The parties in *Kissick* reached a settlement in October 2013, after Crute was issued his citation in this case. Following the *Kissick* settlement, ch. Adm 2 was amended to allow groups of 12 or fewer persons to use the ground floor or

¶ 41. One key to understanding the district court's *Kissick* opinion and order is understanding that the district court did *not* hold that the rule could be constitutionally enforced as to events with more than 20 persons. Indeed the opinion did not affirmatively approve of enforcement at all. Rather, the opinion concluded that the plaintiff was entitled to some temporary protection from enforcement while the merits of the suit were litigated. Balancing equities and acknowledging a proposition that is not in dispute in this appeal—that the State may require a permit for groups anticipated to be large enough to interfere with the normal use of the Capitol—the district court selected a 20–person threshold and enjoined enforcement at and below that threshold. The district court provided no assurance that enforcement above that level was lawful.

¶ 42. Another key to understanding *Kissick* is understanding that the district court did *not* hold that the language of the rule could be construed to include 21 as the numerical floor for enforcing the permit requirement. That is, the district court in *Kissick* did *not* conclude that the rule could be interpreted as meaning that its permit requirement applied only to groups anticipated to attract more than 20 persons.

¶ 43. The State repeatedly mischaracterizes the meaning and import of *Kissick*:

first floor of the Capitol rotunda without applying for a permit and without providing advance notice. *See* Wis. Admin. Code §§ Adm 2.04(2z) and 2.14(2)(vm) (effective August 1, 2014). The amended rule following the *Kissick* settlement is not the rule at issue in this case. This case concerns only the emergency rule that governed at the time of Crute's citation, which, as already noted, did not specify a minimum group size for triggering the permit requirement.

- The State cites *Kissick* for the proposition that the rule was "tailored to serve the Department's stated objectives." However, at best, *Kissick* supports the proposition that *if* the rule could be read as specifying a high enough numerical floor, it might be "tailored." 956 F. Supp. 2d at 1004 ("the state *does* have a significant interest in requiring an advance permit for *every* event that can reasonably be expected to attract large crowds" (alteration in original)).

- The State asserts: "The court found no constitutional problem enforcing the existing permitting system for gatherings expected to draw more than 20 people in the Capitol." However, as we explain above, the district court merely enjoined the Department from "enforcing the permit requirement for gatherings expected to draw 20 or fewer persons inside the Capitol rotunda." The court did not opine as to the constitutionality of enforcing the permit requirement for groups over 20. *Id.* at 985.

- The State asserts: "Under *Kissick*, the Department may require permits for events in excess of 20 people under the existing system." This statement is wrong. The district court said nothing about what the Department may do with respect to groups of more than 20 persons.

- The State asserts that *Kissick* "allowed the Department to continue the 'existing' permitting system for larger events." Again, the court said nothing about what the Department may do for groups of more than 20 persons.

As indicated, none of these statements by the State find support in *Kissick*. The portion of *Kissick* that the State cites in support simply repeated the injunctive relief granted to the plaintiff—that is, the Department was prohibited from "enforcing the permit requirement for

453

gatherings expected to draw 20 or fewer persons."
*Kissick*, 956 F. Supp. 2d at 985. The State fails to direct
our attention to any language in *Kissick* that opined as
to the constitutionality of enforcing the permit require-
ment for events expected to draw more than 20 persons.

¶ 44. In sum and as the circuit court here under-
stood, *Kissick*, properly read, did not hold that the
Department could lawfully enforce the rule as to per-
sons involved in events made up of more than 20 people
and, more specifically, did not hold that the rule was
amenable to a 21–person numerical floor construction
so as to save it from a facial challenge. Therefore, the
State's reliance on the *Kissick* decision for the proposi-
tion that the circuit court could have independently
inserted 21 as a numerical floor fails.

### 3. The Department's Response to Kissick

¶ 45. In the alternative, the State contends that
the circuit court should have considered and adopted
the Department's interpretation and implementation of
the permit scheme. By "interpretation and implemen-
tation" the State is referring to the actions that the
Department took in response to the preliminary injunc-
tion issued by the district court in *Kissick*. As we explain
below, the State fails to support its proposition that the
Department's response to the *Kissick* order amounted to
the Department interpreting the rule to include a
21–person numerical floor for enforcement. And, to the
extent the Department "implemented" a 21–person nu-
merical enforcement floor, the State fails to explain why
such implementation matters for purposes of applying
the case law on which the State relies.

¶ 46. The State cites case law that sets out the
general proposition that a court, in evaluating whether

a regulation is narrowly tailored, may consider a narrowing construction that a government has given the challenged law. For example, the State cites *Forsyth County*, 505 U.S. at 131 for the proposition that when analyzing a "facial challenge, [courts] must consider the [government's] authoritative constructions of the [regulation], including its own implementation and interpretation of it." Similarly, the State cites *Ward*, 491 U.S. at 795–96, which explains: "Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for '[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.' " (Quoted source omitted.)

¶ 47. In *Forsyth County*, *Ward*, and all other cases brought to our attention, the references to an interpretation, implementation, and narrowing construction were references to the governmental entity at issue having previously limited the reach of a broad law, as evidenced by the entity having, independent of a directive from a court, undertaken a past practice in implementing the law. *See Forsyth Cnty.*, 505 U.S. at 130–33 (striking down a parade and assembly ordinance, in part by looking to evidence that, prior to any litigation, the county administrator had based a parade and assembly fee on his own judgment); *Ward*, 491 U.S. at 784, 796 (upholding a city regulation requiring performers in a bandshell to use sound-amplification equipment and a sound technician provided by the city, in part by looking to evidence that the city, apparently prior to any litigation, had a history of deferring to sponsors' desires concerning sound); *Sauk Cnty. v. Gumz*, 2003 WI App 165, ¶¶ 25, 66–67, 266 Wis. 2d 758, 669 N.W.2d 509 (upholding certain portions of a county open-air assem-

bly ordinance by looking at evidence that the county had, prior to litigation, interpreted and implemented the term "minimum" as a misprint and to mean "maximum," and the hard-wired telephone line requirement as applying only in areas where cellular phones did not adequately function).[12] That is to say, in each case the governmental entity itself, prior to litigation, had independently determined that it would interpret and apply the law more narrowly than written. There is no suggestion in any of the cases brought to our attention, or which we have detected through our own effort, that compliance with a court order constitutes interpreting and implementing in this context.

¶ 48. As we have explained, the *Kissick* opinion and order enjoined the Department from enforcing the permit requirement for "events in the Capitol that are anticipated to attract 20 or fewer persons." In response to this order, and in the words of the State in its appellate briefing, "the Department stated that it would comply and enforce the permit requirement for groups of more than 20 people." "Thereafter," in the State's words, "the Department and police required and enforced permits only at events with more than 20 people." As the State's own phrasing suggests, there is nothing in the record before us suggesting that the Department did anything other than comply with the *Kissick* order that enjoined the Department from requiring permits

---

[12] *See also, e.g., Desert Outdoor Advertising, Inc. v. City of Oakland*, 506 F.3d 798, 803 (9th Cir. 2007) (court upheld advertising sign ordinance in part by looking at evidence that the city had construed the ordinance as not applying to noncommercial speech); *Beal v. Stern*, 184 F.3d 117, 127 (2nd Cir. 1999) (court affirmed denial of preliminary injunction motion in case challenging city parks assembly ordinance, in part by looking to evidence that agency offered alternative locations when permit application was denied).

456

for events anticipated to attract 20 or fewer people. Indeed, if the *Kissick* order had been lifted, there is no reason, based on the record before us, to believe that the Department would have continued to adhere to the 21–person numerical enforcement floor. Rather, the briefing on appeal suggests that the State continues to believe that a lower floor would suffice. *See supra* note 10; *see also City of Lakewood*, 486 U.S. at 770) (a court cannot "presume[ ] the [government] will act in good faith and adhere to standards absent from the ordinance's face"); *United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

¶ 49.　Accordingly, when the State asserts that the Department's enforcement of this "greater than 20 person threshold" constituted the "interpretation and implementation of the enforcement agency," that assertion is unaccompanied by an analysis demonstrating why the Department's actions might actually have been "interpretation and implementation" within the meaning of the case law on this topic.

¶ 50.　In sum, the State fails to meet its burden to show that the circuit court erred when it declined to consider the Department's response to the *Kissick* preliminary injunction as a narrowing construction of the rule.[13]

---

[13] The State also asserts that the circuit court "grafted vagueness doctrine into its First Amendment decision." Contrary to the State's representation, the circuit court rested its decision on its determination that the rule did not satisfy the time, place, and manner test, not on any conclusion as to vagueness. The court expressly distinguished the claim and

## CONCLUSION

¶ 51. For the reasons set forth above, the State fails to persuade us that it met its burden of proving beyond a reasonable doubt that the rule was a constitutional restriction on speech and expressive conduct protected by the First Amendment. Accordingly, we conclude that the circuit court did not err in deciding that WIS. ADMIN. CODE § Adm 2.14(2)(vm)5. was not a valid time, place, and manner regulation of speech because it was not narrowly tailored to further the State's significant government interests. Accordingly, we affirm.

*By the Court.*—Order affirmed.

analysis under the time, place, and manner test from the same under the vagueness doctrine. If the State is suggesting that it was somehow improper for the circuit court to inquire during oral argument about why the State did not, by simply amending the rule, provide fair notice of its new interpretation and implementation, we disagree. Obviously, when complicated legal topics are discussed, courts routinely make inquiries and observations that are not necessary to a decision. Moreover, the circuit court's inquiry was appropriate in the context of examining the State's position in light of the *Kissick* litigation. We understand the circuit court to have been opining that it appeared the State could have promptly amended the rule to eliminate Crute's primary argument, that the failure to set a reasonable numerical floor for enforcement meant that the rule was not narrowly tailored. Therefore, we reject the State's argument that the circuit court improperly "grafted vagueness doctrine" onto its decision.